# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-KA-01038-SCT

*DOMINIC C. ROBINSON a/k/a DOMINIC*
*CARLOUS ROBINSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/16/2014 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| TRIAL COURT ATTORNEYS: | KATHLYN ROSE VAN BUSKIRK |
| | RICHARD C. CONANT |
| | ANTHONY N. LAWRENCE, III |
| | GEORGE S. SHADDOCK |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE STATE PUBLIC |
| | DEFENDER |
| | BY: HUNTER N. AIKENS |
| | DOMINIC C. ROBINSON (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KAYLYN H. McCLINTON |
| DISTRICT ATTORNEY: | ANTHONY N. LAWRENCE, III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/19/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## BEFORE WALLER, C.J., COLEMAN AND CHAMBERLIN, JJ.

### WALLER, CHIEF JUSTICE, FOR THE COURT:

¶1.    In July 2014, a Jackson County jury found Dominic C. Robinson guilty of three counts

of aggravated assault, and he was sentenced to serve a total of thirty years in the custody of

the Mississippi Department of Corrections. Robinson now appeals his convictions, arguing

that the trial court erred in its evidentiary rulings and instructions to the jury and that his convictions are not supported by the weight of the evidence. In addition to those issues, which were raised by the Office of Indigent Appeals, Robinson has filed a pro se supplemental brief raising eleven additional assignments of error. Finding no reversible error, we affirm Robinson's convictions and sentences.

## FACTS & PROCEDURAL HISTORY

¶2. On March 5, 2011, Robinson told his girlfriend, Mary Adams, that he was going to a rap concert in Moss Point that night. Adams described Robinson as having braids, a moustache, and a goatee on the night in question. After Robinson left for the concert, Adams did not see him again until three days later, at which point he had shaved off his goatee.[1]

¶3. Between the late evening hours of March 5, 2011, and the early morning hours of March 6, 2011, Robinson attended a concert by rapper Lil Phat at the Creme De La Creme nightclub in Moss Point. The club had hired several members of Showtime Security to serve as security guards for the event. Jonathan Woods was assigned to stand inside the front door of the club and make sure that concert-goers paid before they entered. Darius Wright, Carmen Thompson, and Jonathan's wife Jessica Woods were working just outside the front door, securing the line into the club and searching concert-goers as they entered. Charles Tyler White was assigned to the door of the club's VIP room.

¶4. During the concert, Robinson attempted to enter the club's VIP room, which was reserved for guests with VIP passes. White did not allow Robinson to enter the VIP room

---

[1] This change of appearance is relevant because the witnesses to the shooting testified that the shooter had a goatee.

because he did not have a pass. White described Robinson as having dreadlocks and a goatee and wearing a white t-shirt and blue jeans. Robinson returned to the VIP area a second time, and White again denied him entry. At this point, Robinson became irate and tried to push his way past White. White responded by restraining Robinson and physically removing him from the nightclub.

¶5. In the parking lot, Robinson spoke with security guard Darius Wright, who had known Robinson for about fifteen years. Wright also described Robinson as having braided hair and a goatee and wearing a white shirt and blue jeans. Robinson told Wright that he was allowed to re-enter the club, so Wright searched him and let him back in.[2] However, Robinson was escorted back out of the club just a few minutes later. Robinson asked Wright for the name of the man who had kicked him out of the club and wanted to know when his shift ended, stating, "I'm going to get him [security guard Charles Tyler White]. I want to know what time he get off." Wright would not give Robinson this information, so Robinson and his brother Darold Payne left the parking lot.

¶6. Later that night, Robinson approached the nightclub and tried to enter a third time. At this point, Wright was opening the tailgate of a truck parked near the club's entrance in an effort to prevent people from cutting through the line into the club. Wright noticed that Robinson had changed his shirt since the last time he had seen him. Robinson walked over to Wright, and Wright asked him to leave the club. Wright was standing on the side of the

___

[2] Wright explained that he had seen Robinson speaking with another security guard and assumed that he had been cleared to re-enter the club. However, his supervisor later told him that once a person has been removed from the club, he or she should not be allowed back in.

truck nearest the entrance to the club, and Robinson was standing on the other side. At this time, Damion Kimble approached Wright and began talking to Robinson. Kimble stated at trial that he had known Robinson all his life. Robinson told Kimble not to go into the nightclub, so Kimble turned around and left.

¶7. Wright spoke with Robinson and tried to get him to leave, but Robinson was unwilling to do so. Wright then turned away from Robinson to go back to his station at the front door of the club. At this point, Carmen Thompson saw Robinson draw a handgun and point it at the front of the nightclub. Thompson yelled "Gun!" and tackled Wright out of Robinson's line of sight. Wright then glanced around and saw Robinson shooting at Jonathan and Jessica Woods. According to Wright, Thompson drew her pistol and fired a shot that hit the truck's tailgate, causing Robinson to turn and run. Thompson, however, denied firing her weapon. After the shooting stopped, Wright called 911 and remained at the scene until an ambulance arrived.

¶8. Jonathan Woods was shot once in the buttocks; the bullet passed through his pelvis and lodged itself at the base of his spine. Jessica Woods was shot a total of five times in the chest, back, hips, and legs. The gunshots to her chest injured her spine and left her paralyzed from the chest down. Three nightclub patrons, Ara Osgood, Anquaneshia Thomas, and Dawonshea Wells, were shot in their right legs.

¶9. Detective Johnny Jefferson with the Moss Point Police Department responded to a call of reported gunshots at the nightclub at around 2:50 a.m. on March 6, 2011. He arrived to find a chaotic scene, with people running out of the building and into the parking lot.

4

Detective Jefferson saw Jonathan lying on his stomach in the club's entryway, and Jessica was being treated in a nearby ambulance.[3] Later, Detective Jefferson traveled to Singing River Hospital and spoke to the nightclub patrons who had sustained gunshot wounds.

¶10.  Detective J.D. Savage with the Moss Point Police Department arrived at the nightclub as other police officers were securing the scene. The police located twelve nine-millimeter bullet casings in the parking lot, which were collected and photographed. Bullet fragments were found near the entrance to the nightclub and inside near the bar, and there were four bullet holes in the glass door at the front of the club. After leaving the nightclub, Detective Savage went to the hospital and spoke with Jonathan, Osgood, Wells, and Thomas.  He did not speak with Jessica because she was in surgery at the time.

¶11.  Robinson's brother Darold Payne initially was identified as a possible suspect in the shooting, but he was ruled out after Detective Savage spoke with Wright, who identified Robinson as the shooter.  Wright also identified Robinson from a six-person photographic lineup. Robinson turned himself in to the Pascagoula Police Department on March 9, 2011. Detective Savage went to Pascagoula to speak with Robinson, but Robinson refused to talk until his attorney arrived. Robinson's attorney never showed up, and Robinson was transferred to the Moss Point Police Department several days later. Robinson never gave a statement to the police.

---

[3] Jonathan Woods testified that he fell to the ground inside the front door of the club when he was shot.

¶12.    On August 21, 2012, a Jackson County grand jury indicted Robinson on five counts of aggravated assault.[4]  Robinson's trial was held on July 14-16, 2014.  At the conclusion of the State's case-in-chief, the trial court granted Robinson a directed verdict as to Count III (Thomas) and Count IV (Wells), finding that the State had failed to present sufficient evidence to support those charges.[5]  Robinson then testified in his own defense. Robinson admitted that he had attended the concert at the Creme De La Creme nightclub on the night in question. He also admitted that he had been thrown out of the club, but he claimed that he had been mistaken for another person. Robinson testified that, after being thrown out of the club, he left and drove to Mobile, where he sold music CDs over the weekend. Robinson then went to his grandmother's house. Robinson contended that he had not owned a gun since 2008 or 2009 and did not know how to fire a gun. Robinson believed that Tommy Landrum, the owner of Showtime Security, was trying to pin the shooting on him to cover up the fact that the security guards had "jumped" him for no reason.

¶13.    At the conclusion of the trial, the jury returned a verdict finding Robinson guilty of the remaining three counts of aggravated assault (Counts I, II, and V).  The trial court sentenced Robinson to serve concurrent sentences of twenty years for Counts I and II.  The

---

[4] The indictment alleges that, on or about March 6, 2011, Robinson did unlawfully, willfully and purposely cause bodily injury to Jonathan Woods (Count I), Ara Osgood (Count II), Anquaneshia Thomas (Count III), Dawonshea Wells (Count IV), and Jessica Woods, (Count V), by shooting the victims with a pistol, contrary to Section 97-3-7-2(b) of the Mississippi Code.

[5] Thomas and Wells did not testify at trial, and in their absence, the trial court found that the State had not presented sufficient evidence to prove the elements of the charges involving them.

6

trial court also sentenced Robinson to serve a sentence of twenty years for Count V, to run consecutively to the sentences in Count I and II, and with ten years in Count V suspended and five years of post-release supervision, for a total of thirty (30) years to serve.

¶14.    Robinson, now represented by the Office of Indigent Appeals, appeals his convictions to this Court, raising the following issues:

> I.      **Whether the trial court erred in granting Instruction S-14A.**
>
> II.     **Whether the trial court erred in excluding Exhibit D-1.**
>
> III.    **Whether the State impermissibly commented on Robinson's post-*Miranda* silence.**
>
> IV.     **Whether the verdicts were against the overwhelming weight of the evidence.**

In addition, Robinson has filed a pro se supplemental brief[6] raising eleven additional issues, which we reorganize and restate as follows:

> V.      **Whether Robinson was denied effective assistance of counsel.**
>
> VI.     **Whether the State engaged in prosecutorial misconduct during Robinson's trial.**
>
> VII.    **Whether the State violated Robinson's due-process rights by delaying his indictment.**
>
> VIII.   **Whether the State failed to preserve exculpatory evidence.**
>
> IX.     **Whether the State knowingly introduced false, incompetent, and inflammatory evidence, resulting in an unfair trial.**

---

[6] "An appellant in a criminal appeal may file a pro se supplemental Brief of the Appellant.  This pro se brief may address issues not raised by counsel, but such issues must be based on the record." Miss. R. App. P. 28(b)

**X.     Whether the trial court erred in limiting Robinson's cross-examination of Damion Kimble.**

**XI.    Whether the State violated Robinson's right to a fair trial by supplying false information during closing arguments.**

## DISCUSSION

**I.      Whether the trial court erred in granting Instruction S-14A.**

¶15.   At trial, three witnesses testified that the shooter was the same man who had been kicked out of the nightclub earlier in the night in question, and their descriptions of the shooter matched Robinson's physical appearance. However, Darius Wright was the only witness who had known Robinson personally prior to the shooting. Wright told Detective Savage that Robinson was the shooter, and he identified Robinson from a six-person photo lineup. Wright also identified Robinson at trial. At the conclusion of the trial, the State offered Instruction S-14A, which instructed the jury on eyewitness identification testimony:

> The Court instructs the Jury that the burden is on the State to prove beyond a reasonable doubt that the offense was committed and that the defendant was the person who committed it. You have heard the evidence regarding the identification of the defendant as the person who committed the crime. In this connection, you should consider the witness's opportunity to observe the criminal act and the person committing it, including the length of time the witness had to observe the person committing the crime, the witness's state of mind, and any other circumstances surrounding the event. You should also consider the witness's certainty or lack of certainty, the accuracy of any prior description, and the witness's credibility or lack of credibility, as well as any other factor surrounding the identification.
>
> *You have heard evidence during the trial that the witness, Darius Wright, identified the defendant. The identification of the defendant by a single eyewitness, as the person who committed the crime, if believed beyond a reasonable doubt, can be enough evidence to convict the defendant.*

8

It is for you to determine the reliability of any identification and give it the weight you believe it deserves.

Robinson objected to the portion of the instruction that stated that the identification testimony of a single witness could be sufficient to convict a defendant. The trial court overruled Robinson's objection and granted Instruction S-14A. On appeal, Robinson argues that Instruction S-14A impermissibly commented on the weight of the evidence by emphasizing Wright's identification testimony.

¶16. The grant or denial of jury instructions is reviewed for an abuse of discretion. *Newell v. State*, 49 So. 3d 66, 73 (Miss. 2010). This Court reads jury instructions as a whole, with no single instruction taken out of context. *Rushing v. State*, 911 So. 2d 526, 537 (Miss. 2005). "[I]f the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Newell*, 49 So. 3d at 73. In addition, while the defendant has a right to present his theory of the case through jury instructions, he is not entitled to instructions which incorrectly state the law, have no basis in the evidence, or are covered fairly elsewhere in the instructions. *Harris v. State*, 861 So. 2d 1003, 1012-13 (Miss. 2003).

¶17. "Our law of criminal procedure has long perceived dangers in comments upon the evidence[.]" *Hansen v. State*, 592 So. 2d 114, 141 (Miss. 1991). This Court has held that "[a] jury instruction that emphasizes any particular part of the testimony given at trial in a manner as to amount to a comment on the weight of the evidence, is improper." *Montgomery v. State*, 891 So. 2d 179, 184 (Miss. 2004) (citing *Manuel v. State*, 667 So. 2d 590, 592 (Miss. 1995)). Applying this principle, we repeatedly have affirmed the trial court's denial of jury instructions that attempt to tell the jury what weight to assign to the evidence, rather

9

than allowing the jury to make its own credibility determinations. *See Hansen*, 592 So. 2d at 141 (affirming denial of defense instruction cautioning jurors against giving undue credence to the testimony of law enforcement officials); *Goss v. State*, 413 So. 2d 1033, 1035 (Miss. 1982) (affirming denial of defense instruction stating that the uncorroborated testimony of the victim of a sex crime should be scrutinized with extreme caution); *Hines v. State*, 339 So. 2d 56, 58 (Miss. 1976) (affirming denial of defense instruction advising jury that no class of testimony is less credible than that of identity). "The presence of evidence tending to prove facts mentioned in an instruction does not mean that the jury has to believe what the 'evidence shows' where there is also evidence to the contrary." *Manuel*, 667 So. 2d at 592-93.

¶18.    Robinson argues that Instruction S-14A improperly commented on the weight of Wright's testimony by pointing the jury specifically to Wright's identification of Robinson and stating that the testimony of one eyewitness can be sufficient to convict. We find no merit in this argument. First, unlike the instructions in *Hansen*, *Goss*, and *Hines*, Instruction S-14A did not require the jury to assign a certain weight to Wright's testimony. On the contrary, Instruction S-14A specifically told the jury, "It is for you to determine the reliability of any identification and give it the weight you believe it deserves." In addition, Instruction S-14A did not require the jury to convict Robinson even if it believed Wright's testimony. Rather, the instruction provides that "[t]he identification of the defendant by a single eyewitness, as the person who committed the crime, if believed beyond a reasonable doubt, *can be* enough evidence to convict the defendant," which is a correct statement of law. *See*

*Doby v. State*, 532 So. 2d 584, 591 (Miss. 1988) (recognizing the rule that "persons may be found guilty on the uncorroborated testimony of a single witness"). Instruction S-14A left to the jury the task of judging the credibility of Wright's testimony and weighing it against the other evidence presented at trial. We hold that the mere mention of Wright's testimony in Instruction S-14A did not amount to an improper comment on the weight of the evidence.

## II. Whether the trial court erred in excluding Exhibit D-1.

¶19. After the State had rested at Robinson's trial, Robinson attempted to admit into evidence Exhibit D-1, which was an order entered on August 3, 2011 – six months after the shooting in this case – in a criminal cause in which Darius Wright was the defendant. The order shows that the prosecution moved to reduce a pending drug-possession charge against Wright from a felony to a misdemeanor. The trial court granted this motion, and Wright pleaded guilty to the misdemeanor. Wright was sentenced to a six-month suspended sentence, six months of nonreporting probation, and a monetary fine. Notably, the order does not list the date of Wright's offense or the date on which he was formally charged.

¶20. Robinson argued that Exhibit D-1 would "go to Mr. Wright's testimony or his credibility." The trial court analyzed Exhibit D-1 under Rule 609 of the Mississippi Rules of Evidence and concluded that the exhibit was inadmissible because it was not probative of Wright's "veracity or credibility." On appeal, Robinson contends that the trial court erred in excluding Exhibit D-1.

¶21. "The standard of review for the admission or exclusion of evidence is abuse of discretion." *Williams v. State*, 54 So. 3d 212, 213 (Miss. 2011) (citation omitted). "However,

this discretion must be exercised within the confines of the Mississippi Rules of Evidence." ***Cox v. State***, 849 So. 2d 1257, 1268 (Miss. 2003) (citation omitted).

¶22. As an initial matter, we find that the trial court did not err in finding that Exhibit D-1 was inadmissible under Rule 609. Rule 609 allows admission of evidence of a criminal conviction evidence under certain circumstances for the purpose of "attacking a witness's character for truthfulness." Miss. R. Evid. 609(a). But because Wright's conviction imposed a sentence of less than one year, Exhibit D-1 would be admissible under Rule 609 only "if the court can readily determine that establishing the elements of the crime required proving – or the witness's admitting – a dishonest act or false statement." Miss. R. Evid. 609(a)(2). The elements of possession of a controlled substance do not require proof of a dishonest act or false statement, so Exhibit D-1 was not admissible to attack Wright's character for truthfulness under Rule 609.

¶23. Robinson now claims, however, that he was not attempting to admit Exhibit D-1 under Rule 609 to attack Wright's character for truthfulness. Instead, Robinson asserts that he intended to use Exhibit D-1 to show that Wright had made a deal with law-enforcement authorities for leniency in his drug-possession case in exchange for his testimony in Robinson's case. In other words, he argues that his purpose for offering Exhibit D-1 "was not simply to discredit [Wright] because he had been convicted of such a crime (which may very well have been inadmissible under some provision of Rule 609), but to ferret out any motive or reason [Wright] might have to be such a favorable state witness." ***Bevill v. State***, 556 So. 2d 699, 713-14 (Miss. 1990). Accordingly, Robinson argues that Exhibit D-1 was

12

admissible under Rule 616, which provides, "Evidence of a witness's bias, prejudice, or interest – for or against any party – is admissible to attack the witness's credibility." Miss. R. Evid. 616.

¶24. We find that Robinson failed to inform the trial court of the substance of his argument with an offer of proof sufficient to preserve this claim of error. *See* Miss. R. Evid. 103(a)(2). Beyond generally stating that Exhibit D-1 would go to Wright's "credibility," Robinson never specifically argued Rule 616 as a basis for Exhibit D-1's admissibility. In fact, while considering the admissibility of Exhibit D-1, the trial court stated, "I don't think the question is whether that relates to any kind of deal [Wright] may have had with the District Attorney. It's being offered as impeachment evidence in regard to his truthfulness under Rule 609." Robinson did not respond to this statement to correct what he now claims to be the trial court's misunderstanding of his argument. Accordingly, we find that Robinson's argument is procedurally barred, because the issue of Wright's bias, prejudice, or interest was not presented clearly to the trial court.

¶25. In addition, "Rule 616 must be interpreted as it relates to other rules of evidence, particularly [Rules] 104, 401 and 402." *Tillis v. State*, 661 So. 2d 1139, 1142 (Miss. 1995). For evidence of bias or interest to be admissible under Rule 616, "[i]t must have the tendency, in the case being tried, to make the facts to which the witness testified less probable than they would be without the evidence of bias." *Id.* Simply stated, Exhibit D-1 has no independent relevance to the issue of Wright's bias, prejudice, or interest. Exhibit D-1 does not mention any deal between Wright and the State in this case, and Robinson failed to offer any other

13

proof that Wright had been offered leniency in his drug-possession case in exchange for his testimony against Robinson.[7] Robinson also never asked Wright whether he had received favorable treatment in exchange for his testimony. In fact, Wright's drug-possession charge was never mentioned during the State's case-in-chief. Robinson relies solely on the proximity in time between Wright's identification of Robinson as the shooter and his guilty plea in the drug-possession case to argue that there is a connection between the two events. But this argument amounts to mere speculation, as there is no evidence that Wright's drug charge even existed at the time of his meeting with Detective Savage. Accordingly, Robinson failed to lay a sufficient foundation to show that Exhibit D-1 was relevant evidence of Wright's bias or interest. *Tillis*, 661 So. 2d at 1142.

### III.   Whether the State commented on Robinson's post-*Miranda* silence.

¶26.   Robinson turned himself in to the police on March 9, 2011, three days after the shooting. After being read his *Miranda*[8] warnings, he told the police that he would not speak without his attorney present. Robinson never gave a statement to the police. Prior to trial, the State demanded notice of Robinson's intent to offer an alibi defense, but it received no response. *See* URCCC 9.05. At trial, Robinson testified that he left the Creme De La Creme prior to the shooting and spent the rest of the weekend in Mobile selling music CDs. At the conclusion of its cross-examination of Robinson, the State asked the following question:

---

[7] We note that the State is required to disclose witness leniency or immunity deals to the defense. *Barnes v. State*, 460 So. 2d 126, 131 (Miss. 1984).

[8] *Miranda v. Arizona*, 86 S. Ct. 1602, 384 U.S. 436 (1966).

Q: I got one more question. The whole thing about Mobile and you not being [at the nightclub during the shooting]?

A: Yes, sir.

Q. First time that's ever been told is to this jury, isn't it?

A: Okay; yes, sir.

Robinson did not object to this line of questioning, and the State did not ask Robinson any further questions.

¶27. On appeal, Robinson argues that the above-quoted question was an improper comment on his exercise of his constitutional right to remain silent. Robinson concedes that this argument is procedurally barred from consideration on appeal because he did not object to the State's question at trial. "If no contemporaneous objection is made, the error, if any, is waived." *Cole v. State*, 525 So. 2d 365, 369 (Miss. 1987). Nevertheless, Robinson asks this Court to review the issue for plain error. To determine whether plain error has occurred, the reviewing court must determine: (1) if the trial court deviated from a legal rule; (2) whether that error is plain, clear, or obvious; and (3) whether the error prejudiced the outcome of the trial. *McGee v. State*, 953 So. 2d 211, 215 (Miss. 2007).

¶28. The *Miranda* warnings contain an implicit guarantee that "silence will carry no penalty," because "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). Accordingly, this Court has held that "it is improper and, ordinarily, reversible error to comment on the accused's post-*Miranda* silence." *Quick v. State*, 569 So. 2d 1197, 1199 (Miss. 1990). We

15

have emphasized that this rule "has been well-settled for over a quarter of a century" and have referred to it as "'black-letter' or 'hornbook' law." *Emery v. State*, 869 So. 2d 405, 410 (Miss. 2004). However, this Court has found that such improper comments may amount to harmless error where evidence of the defendant's guilt is overwhelming. *See Riddley v. State*, 777 So. 2d 31, 35 (Miss. 2000); *Gossett v. State*, 660 So. 2d 1285, 1291-92 (Miss. 1985).

¶29. Robinson relies primarily on *Emery v. State* to support his argument that the prosecutor made an improper comment on his post-*Miranda* silence. In *Emery*, the defendant did not present an alibi defense at trial. *Emery*, 869 So. 2d at 406. On cross-examination, the prosecutor inserted the issue of the defendant's alibi by asking the defendant where he was at the time of the crime. *Id.* The defendant objected to the question, but the trial court allowed the prosecutor to continue. *Id.* After the defendant answered the question, the prosecutor repeatedly asked the defendant whether he had provided anyone with this information prior to trial. *Id.* at 407. The prosecutor then used the defendant's answers to directly attack his credibility during closing arguments: "Folks right there, you can tattoo 'liar' right across his forehead because that's what he did. He took that stand and he lied to you." *Id.* On appeal, this Court reversed the defendant's conviction, noting that "[i]t is lamentable and somewhat disturbing that this clearly enunciated legal principle, with a vintage of over thirty years, escaped both the trial court and the prosecutor." *Id.* at 409.

¶30. We find that *Emery* is distinguishable from this case. The defendant in *Emery* did not offer an alibi defense at trial, so he had no legal duty to inform the prosecution of his whereabouts at the time of the offense. Here, on the other hand, Robinson offered an alibi

16

defense by testifying on direct examination that he left the Creme De La Creme and was traveling to Mobile when the shooting occurred. As such, unlike in *Emery*, Robinson had a duty to inform the prosecution of his intent to rely on an alibi defense and to disclose certain evidence related to that defense:

> Upon the written demand of the prosecuting attorney . . . the defendant shall serve within ten days . . . upon the prosecuting attorney a written notice of the intention to offer a defense of alibi, which notice *shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense* and the names and addresses of the witnesses upon which the defendant intends to rely to establish such alibi.

URCCC 9.05 (emphasis added). "[T]he specific purpose of alibi defense discovery is to allow the state an opportunity of investigation and discovery [of] evidence, if any, which may rebut the anticipated alibi defense." *Coleman v. State*, 749 So. 2d 1003, 1009 (Miss. 1999). "The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played." *Williams v. Florida*, 399 U.S. 78, 82, 90 S. Ct. 1893, 26 L. Ed. 2d 446 (1970) (approving of a Florida rule substantially similar to Rule 9.05). The State demanded notice of Robinson's intent to offer an alibi defense prior to trial, but Robinson did not respond. Accordingly, the State was not made aware of Robinson's alibi defense until he took the witness stand, by which point the State was unable to respond to his defense. Therefore, we find the prosecutor's question to Robinson about the novelty of his alibi defense to be a comment on his failure to comply with a discovery rule rather than an attempt to attack the credibility of his testimony. Under the specific circumstances of this case, we hold that the prosecutor's question did not amount to plain error.

17

## IV. Whether the verdicts were against the overwhelming weight of the evidence.

¶31. In the final assignment of error raised by his appellate counsel, Robinson argues that he is entitled to a new trial because the jury's verdicts were against the overwhelming weight of the evidence. In reviewing a challenge to the weight of the evidence, this Court must accept as true the evidence which supports the verdict. *Boone v. State*, 973 So. 2d 237, 243 (Miss. 2008). This Court will disturb the jury's verdict only "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005) (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)), *abrogated on other grounds by Little v. State*, 233 So. 3d 288, 292 (Miss. 2017). "[W]hen the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980).

¶32. In challenging the weight of the evidence, Robinson focuses primarily on several perceived conflicts in the testimony of the State's witnesses. First, he points out that Detective Savage testified that he recovered nine-millimeter shell casings from the scene of the crime, while Jessica's and Jonathan's medical records indicated that they had been shot by a .45 caliber weapon.[9] Next, he claims that witnesses' identifications of Robinson were based on Wright's identification, which was unreliable because Wright had made a deal for

_____

[9] These medical reports were not admitted into evidence at trial. In fact, Robinson objected to their admission into evidence, and the trial court sustained his objection. Accordingly, the jury did not hear any evidence that Jonathan and Jessica were shot by a .45 caliber weapon.

leniency with the State. In addition, he notes that the State's witnesses provided differing descriptions of the shooter's clothing. Finally, he points out that Thompson's and Wright's testimony conflicted on whether Thompson fired a gun at the shooter. Based on these alleged discrepancies, Robinson contends that he should be granted a new trial.

¶33. We find that the jury's verdicts were not against the overwhelming weight of the evidence presented at trial. Robinson admitted that he was at the Creme De La Creme nightclub on the night of the shooting and that he was thrown out of the club for attempting to enter the VIP room. Five other witnesses testified that a man matching Robinson's description was thrown out of the club during the concert, and three of these witnesses testified that the man who was thrown out of the club was the shooter. One eyewitness, Darius Wright, also positively identified Robinson as the shooter. Robinson's arguments are based on conflicts in the evidence and the credibility of the State's witnesses, matters to be decided by the jury. "It is well settled that in such a case of conflicting testimony, each distinct view is absorbed into the minds of the jury as the finders of fact, and it is within the province of the jury to determine the credibility among several witnesses." *Hughes v. State*, 724 So. 2d 893, 896 (Miss. 1998) (citing *Jackson v. State*, 614 So. 2d 965, 972 (Miss. 1993)). After reviewing the evidence in the record, we cannot say that the jury's verdicts in this case are "so contrary to the overwhelming weight of the evidence that to allow [them] to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844.

¶34. Having addressed the issues raised by Robinson's appellate counsel, we now turn to the issues raised in Robinson's pro se supplemental brief.

19

### V.     Whether Robinson was denied effective assistance of trial counsel.

¶35.    A defendant in a criminal case has a constitutional right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 20152, 80 L. Ed. 2d 674 (1984). However, "[t]here is a strong presumption that counsel's performance falls within the range of reasonable professional assistance. *Id.* at 689. To succeed on a claim of ineffective assistance of counsel, the defendant must prove (1) that his attorney's performance was deficient, and (2) that the deficient performance deprived the defendant of a fair trial. *Dartez v. State*, 177 So. 3d 422, 423 (Miss. 2015). Generally, ineffective-assistance claims are more appropriately brought in post-conviction proceedings. *Id.* at 422-23. "It is unusual for this court to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal," because "there is usually insufficient evidence within the record to evaluate the claim." *Wilcher v. State*, 863 So. 2d 776, 825 (Miss. 2003) (quoting *Aguilar v. State*, 847 So. 2d 871, 878 (Miss. Ct. App. 2002)). This Court addresses ineffective-assistance claims on direct appeal only in cases where "the record affirmatively shows ineffectiveness of constitutional dimensions, or the parties stipulate that the record is adequate and the Court determines that findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Read v. State*, 430 So. 2d 832, 841 (Miss. 1983).

¶36.    Robinson argues that his trial counsel provided ineffective assistance in two ways. First, he argues that his attorney failed to file a motion to dismiss the charges against him in a timely manner. Had such a motion been filed, Robinson argues that at least two, if not all,

of the charges against him would have been dismissed prior to trial.[10] Second, Robinson contends that his attorney failed to conduct an adequate investigation of the case and interview potential witnesses. Robinson claims that a timely and thorough investigation of his case would have resulted in the preservation of certain exculpatory evidence, and he would have been able to call additional witnesses in his defense. Robinson argues that his attorney's deficient performance deprived him of a fair trial.

¶37. We find that Robinson's first claim of ineffective assistance is plainly without merit, because it is based on an incorrect reading of the law. Robinson cites Rule 13.9(c) of the Mississippi Rules of Criminal Procedure to support his claim that his attorney failed to file a timely motion to dismiss the charges against him. But the Rules of Criminal Procedure had not yet been enacted at the time of Robinson's trial. And even if those rules did apply to the instant case, Rule 13.9(c) was not adopted into the Mississippi Rules of Criminal Procedure,[11] and Robinson does not cite any other specific rule that his attorney violated.

¶38. As for Robinson's second claim, the record does not contain sufficient evidence for review on direct appeal. In order to succeed on his claim that his attorney failed to conduct an adequate investigation of the case, Robinson must "state with particularity what the

---

[10] We note that Robinson's attorney was successful in having two of Robinson's charges dismissed at trial.

[11] Rule 13.9(c), which established a specific time limit for filing an indictment following a criminal complaint, was part of a set of rules of criminal procedure proposed by the Uniform Criminal Rules Study Committee to this Court in 2013. *See* Matthew Steffey, *Mississippi Criminal Procedure: Proposed Rules and Comments*, 31 Miss. C. L. Rev. 1, 89 (2013). However, this provision was left out of the final version of the Rules of Criminal Procedure adopted by this Court.

investigation would have revealed and specify how it would have altered the outcome of trial." **Cole v. State**, 666 So. 2d 767, 776 (Miss. 1995). This burden cannot be met without consideration of matters outside the record, and the scope of this Court's review on appeal is confined to the record before the trial court. *See* **Wilcher**, 863 So. 2d at 825 (quoting **Aguilar**, 847 So. 2d at 878). Accordingly, we dismiss Robinson's claim of ineffective assistance based on his attorney's failure to investigate his case so he may pursue it in a properly filed post-conviction petition.

¶39.    Robinson also raises a claim of ineffective assistance against his appellate attorney for failing to present claims of actual innocence and ineffective assistance of trial counsel. But we find it inappropriate to address a claim of ineffective assistance of appellate counsel while Robinson's appeal is pending. Thus, we dismiss this claim as well.

**VI.    Whether the State engaged in prosecutorial misconduct during Robinson's trial.**

¶40.    Robinson argues that the prosecution engaged in a continuous pattern of misconduct during his trial that rendered the trial fundamentally unfair. No objections were raised to any of the following alleged instances of misconduct, and as such, these issues are procedurally barred from review on appeal. *See* **Rubenstein v. State**, 941 So. 2d 735, 755 (Miss. 2006) (citing **Howard v. State**, 507 So. 2d 58, 63 (Miss. 1987)). However, "where an appellant cites numerous instances of improper and prejudicial conduct by the prosecutor, this Court has not been constrained from considering the merits of the alleged prejudice by the fact that objections were made and sustained or that no objections were made." **Smith v. State**, 457 So. 2d 327, 333-34 (Miss. 1984). "Where prosecutorial misconduct endangers the fairness

of a trial and the impartial administration of justice, reversal must follow." ***Goodin v. State***, 787 So. 2d 639, 445 (Miss. 2001) (citing ***Acevedo v. State***, 467 So. 2d 220, 226 (Miss. 1985)). We review each of Robinson's allegations separately below.

> **A.** **Whether the State elicited irrelevant and inflammatory testimony implying other criminal conduct committed by Robinson.**

¶41. Robinson argues that the State committed misconduct by eliciting irrelevant and prejudicial testimony from several witnesses that implied that Robinson may have engaged in other criminal acts for which he was not charged. Robinson points to two specific instances of this alleged misconduct. First, during its redirect examination of Detective Savage, the State asked whether a person could buy a firearm "off the street" without filling out any registration paperwork. Robinson asserts that this line of questioning was irrelevant and inflammatory because the State never recovered the gun used in the shooting and presented no evidence that he even owned a gun. Second, Robinson claims that the State asked him questions on cross-examination that were meant to insinuate that he was selling CDs illegally on the days following the shooting.

¶42. We find that Robinson's arguments lack merit. The State's question to Detective Savage concerning the purchase of firearms was asked in direct response to questions posed by Robinson on cross-examination. Specifically, Robinson asked Detective Savage, "If I bought a gun today in Pascagoula, would it be registered with anybody?" He then asked Detective Savage if he had checked any firearms records to determine whether Robinson owned a gun. The State's questions on redirect simply clarified an issue raised by Robinson

on cross-examination.  "Where the defense attorney inquires into a subject on cross-examination of the State's witness, the prosecutor on rebuttal is unquestionably entitled to elaborate on the matter." *Crenshaw v. State*, 520 So. 2d 131, 133 (Miss. 1988) (citing *Winters v. State*, 449 So. 2d 766 (Miss. 1984)).  Additionally, the State's cross-examination of Robinson concerning his sale of CDs was not improper.  Robinson testified during direct examination that he was in Mobile selling CDs on the days immediately following the shooting.  On cross-examination, the prosecutor sought to clarify Robinson's testimony:

Q:      You had indicated you sell CDs.  What does that mean, sell CDs?

A:      I make music.

Q:      You make music CDs?

A:      Yes, sir, I make music.

Q:      It's your own music that you're selling?

A:      Yes, sir.

Q:      You don't sell anybody else's?

A:      No, sir.

Contrary to Robinson's assertions, this line of questioning does not insinuate that Robinson's act of selling CDs was illegal.

### B.      Whether the prosecutor impermissibly implied that Robinson had fled the scene of the crime.

¶43.    Robinson argues that the State committed misconduct by implying through questions to witnesses and arguments to the jury that Robinson had fled the scene of the crime.  For example, in response to Robinson's testimony that he went to Mobile "to get away," the State

24

asked Robinson on cross-examination, "You were getting away from a shooting, aren't you? That's what you're getting away from." During closing argument, the State contended that Robinson was "hiding" in Mobile before he turned himself in to the police. The prosecutor also returned to Robinson's statement that he went to Mobile "to get away" by arguing, "Members of the jury, he has been trying to get away for three years now. It's time to hold him accountable for his actions on March 6, 2011." Robinson argues that these questions and statements were improper because he had explained during his testimony that he had left the nightclub before the shooting started.

¶44.    We find no merit in Robinson's allegations of misconduct. "Mississippi allows wide-open cross-examination of any matter that is relevant . . . ." *Anthony v. State*, 108 So. 3d 394, 397 (Miss. 2013) (citing *Meeks v. State*, 604 So. 2d 748, 755 (Miss. 1992)). "Where an accused, on direct examination, seeks to exculpate himself, such testimony is subject to normal impeachment via cross-examination . . . ." *Stewart v. State*, 596 So. 2d 851, 853 (Miss. 1992). Here, the State presented evidence that Robinson fled the scene of the crime after shooting Jonathan and Jessica. Robinson attempted to explain his flight by testifying on direct examination that he left the nightclub before the shooting occurred and that he had gone to Mobile to sell CDs. Robinson also testified specifically that he had gone to Mobile to "get away." On cross-examination, the State was entitled to point out the conflicts between Robinson's testimony and that of the other witnesses.

¶45.    In addition, attorneys are allowed to comment on the evidence and testimony presented at trial. *Sheppard v. State*, 777 So. 2d 659, 661 (Miss. 2000). And generally,

25

"flight is admissible as evidence of consciousness of guilt." ***Fuselier v. State***, 702 So. 2d 388, 390 (Miss. 1997) (citing ***Williams v. State***, 667 So. 2d 15, 23 (Miss. 1996)). The prosecutor's statements during closing argument were proper comments on the evidence presented at trial, specifically that Robinson had fled the scene of the crime, changed his appearance, and did not turn himself in until several days later.

### C. Whether the prosecutor expressed an improper opinion on Robinson's guilt.

¶46. During closing argument, the prosecutor made the following statement to the jury: "I ask you to please consider the evidence, listen to what every witness has told you, look at all the physical evidence and find [Robinson] guilty on all three counts of aggravated assault because that's what he's guilty of." On appeal, Robinson argues that, in making this statement, the prosecutor improperly expressed his personal opinion on Robinson's guilt.

¶47. "[T]his State does not allow a prosecutor to comment on his personal beliefs about a defendant's guilt or innocence." ***Mack v. State***, 650 So. 2d 1289, 1320-21 (Miss. 1994) (citations omitted). However, as previously discussed, prosecutors have a right to comment on the evidence. ***Id.*** at 1320. In this case, the prosecutor was commenting on the sufficiency of the evidence and did not offer a personal opinion concerning the defendant's guilt. In ***Mack***, this Court found that the prosecutor's repeated use of the phrase "I know" during closing statements was improper, because "[t]he use of 'I' leaves open the inference that the prosecutor personally believed that Mack committed the capital murder." ***Id.*** at 1321. This Court noted, however, that the prosecutor's statements would not have been objectionable if he had refrained from using the pronoun "I." ***Id.*** Here, the prosecutor simply asked the

26

jury to find Robinson guilty after considering all the evidence and did not offer his own opinion. This argument is without merit.

### D. Whether the State infringed on the jury's duty to make credibility determinations.

¶48. During its cross-examination of Robinson, the prosecutor asked a series of questions about whether the State's witnesses were telling the truth when they described Robinson's appearance and clothing on the night of the crime. The prosecutor also asked Robinson if the description of the shooting provided by the State's witnesses was a "fabrication," since it conflicted with his claim that he had left the Creme De La Creme before the shooting occurred. And finally, during closing arguments, the prosecutor stated, "It makes no sense, if you think about this, that every witness who testified to y'all got it wrong. That's what y'all got to believe to turn [Robinson] loose. Every one of them got it wrong." Robinson argues that these questions and comments were inappropriate because they infringed on the jury's right to judge the credibility of the State's witnesses.

¶49. "It is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth." *United States v. Havens*, 446 U.S. 620, 626-27, 100 S. Ct. 1912, 64 L. Ed. 2d 559 (1980). On the other hand, it is a well-established rule that the jury is the sole judge of the credibility of witnesses and the weight of their testimony. *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980). Accordingly, most federal courts and several state courts have held that it is improper for a prosecutor to ask a criminal defendant whether an adverse witness was lying on the stand. *See, e.g.*, *United States v.*

27

*Schmitz*, 634 F.3d 1247, 1268 (11th Cir. 2011); *United States v. Thomas*, 453 F.3d 838, 846 (7th Cir. 2006); *United States v. Williams*, 343 F.3d 423, 437 (5th Cir. 2003); *United States v. Sanchez*, 176 F.3d 1214, 1219 (9th Cir. 1999); *United States v. Sullivan*, 85 F.3d 743, 749-50 (1st Cir. 1996); *United States v. Richter*, 826 F.2d 206, 208 (2d Cir. 1987); *Daniel v. State*, 78 P.3d 890, 904 (Nev. 2003); *State v. Singh*, 793 A.2d 226, 238-39 (Conn. 2002); *Knowles v. State*, 632 So. 2d 62, 65-66 (Fla. 1993). These so-called "were-they-lying" questions are deemed improper because they "invade the province of the jury and force a witness to testify as to something he cannot know, i.e., whether another is intentionally seeking to mislead the tribunal." *United States v. Harris*, 471 F.3d 507, 511 (3d Cir. 2006). Additionally, these questions ignore other possible explanations for conflicting testimony, such as "lapses in memory, differences in perception, or a genuine misunderstanding." *Schmitz*, 634 F.3d at 1269. However, the federal appellate courts have not reversed a conviction based on this issue absent a specific objection at trial, because "it is not likely that such questions, standing alone and without objection, would have 'affected the outcome of the district court proceedings.'" *Harris*, 471 F.3d at 512 (quoting *United States v. Alano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)).

¶50.    After reviewing the record in this case, we find that the prosecutor's questions and comments did not amount to plain error. First, the prosecutor's statement during closing argument was not improper because it did not ask the jury to consider whether the State's witnesses were lying. The prosecutor simply argued that the jury would have to believe that all of the State's witnesses were wrong in order to acquit Robinson. *See United States v.*

*Gaines*, 170 F.3d 72, 81-82 (1st Cir. 1999) (finding that prosecutor did not commit plain error by asking defendant whether other witnesses were "wrong" rather than "lying," because "[t]he witness was not required to choose between conceding the point or branding another witness as a liar.").

¶51. Turning to the prosecutor's questions on cross-examination, we find that, while the prosecutor should not have asked Robinson whether the testimony of another witness was truthful or a "fabrication," the bulk of the prosecutor's questions covered topics of Robinson's prior testimony that did not conflict with that of the State's witnesses. For example, the prosecutor asked Robinson whether the State's witnesses were being truthful when they testified that Robinson was wearing a white shirt and blue jeans on the night of the shooting, but Robinson had just testified that he was wearing a white shirt and blue jeans. The prosecutor also asked Robinson whether Mary Adams was telling the truth when she testified that she told Robinson not to go to the club, but Robinson had testified on direct examination that Adams had told him not to go. In addition, the jury was instructed that it had a duty to determine the credibility of each witness. "Generally speaking, our law presumes that jurors follow the trial judge's instructions, as upon their oaths they are obliged to do." *Parker v. Jones Cty. Comty. Hosp.*, 549 So. 2d 443, 446 (Miss. 1989). Accordingly, we find that the prosecutor's questions did not affect the fundamental fairness of Robinson's trial and therefore did not amount to plain error. *See Conners v. State*, 92 So. 3d 676, 682 (Miss. 2012) (citing *Brown v. State*, 995 So. 2d 698 (Miss. 2008)).

### VII. Whether the State violated Robinson's due-process rights by delaying his indictment.

¶52. The Due Process Clause of the Fifth Amendment has a "limited role" in protecting the criminally accused against oppressive delay by the State in bringing prosecution. *United States v. Lovasco*, 431 U.S. 783, 789, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977). "In a pre-indictment analysis of due process violations . . . the burden of persuasion is on the defendant." *Stack v. State*, 860 So. 2d 687, 700 (Miss. 2003) (citing *Hooker v. State*, 516 So. 2d 1349, 1351 (Miss. 1987)). For a defendant to succeed on a claim that his or her due-process rights were violated by a pre-indictment delay in prosecution, he or she must show that "(1) the pre-indictment delay prejudiced that defendant, and (2) the delay was an intentional device used by the government to obtain a tactical advantage over the accused." *Killen v. State*, 958 So. 2d 172, 189 (Miss. 2007) (citing *Hooker*, 516 So. 2d at 1351).

¶53. Here, the shooting at the Creme De La Creme occurred on March 6, 2011. Robinson was not indicted until August 2012, some seventeen months later. During this time, Robinson claims that he lost contact with possible witnesses, lost his job, and was treated negatively by the community, friends, family, and the police. Meanwhile, he alleges that the State lost exculpatory evidence and was able to secure witnesses and "coach" their testimony. Accordingly, Robinson contends that the delay in his indictment severely impaired his ability to mount an effective defense.

¶54. Because Robinson failed to request dismissal of his indictment based on a violation of his due-process rights, this issue is procedurally barred from review on appeal. *Roberts v. State*, 234 So. 3d 1251, 1268 (Miss. 2017). Procedural bar notwithstanding, Robinson has failed to prove either prong of the *Hooker* test. First, the record contains no evidence

30

supporting Robinson's allegations that the delay in his indictment prejudiced his defense. "Vague assertions of lost witnesses, faded memories, or misplaced documents are insufficient to establish a due process violation from preindictment delay." *De La Beckwith v. State*, 707 So. 2d 547, 570 (Miss. 1997) (quoting *United States v. Beszborn*, 21 F.3d 62, 67 (5th Cir. 1994)). And while it is true that the State lost some evidence related to Robinson's case, there is no indication that this evidence would have been exculpatory.[12] In addition, because Robinson failed to present this issue to the trial court, the record contains no explanation for the delay in Robinson's indictment. "[P]rosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." *Lovasco*, 431 U.S. at 791. In sum, Robinson has failed to show that the State intentionally delayed his indictment to gain a tactical advantage over him.

### VIII. Whether the State failed to preserve exculpatory evidence.

¶55. Detective Savage testified that twelve nine-millimeter bullet casings and several bullet fragments were recovered from the scene of the crime. However, these casings and fragments were lost prior to trial. Detective Savage explained that a new police chief had taken office and had ordered a major purge of the evidence room, which had fallen into complete disarray under the previous administration. Detective Savage believed that the casings and fragments had been discarded during that process. While the casings and fragments were unavailable, the State did introduce photographs of them into evidence. On

---

[12] The State's loss of evidence is discussed in the next issue below.

31

appeal, Robinson argues that the State violated his due-process rights by failing to preserve this evidence.

¶56.   This Court has adopted the following test to determine whether the State's failure to preserve evidence violated the defendant's right to due process:

> (1) the evidence in question must possess an exculpatory value that was apparent before the evidence was destroyed; (2) the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; and (3) the prosecution's destruction of the evidence must have been in bad faith.

*State v. McGrone*, 798 So. 2d 519, 523 (Miss. 2001).  We find that Robinson has failed to prove the first and third prongs of this test. First, there is no clear indication that the casings and fragments possess any apparent exculpatory value.  If anything, the locations of the casings, which were memorialized in photographs that were produced to Robinson during discovery and admitted into evidence at trial, supported the testimony of the State's witnesses concerning the location of the shooter.  And because the weapon used in the shooting was never recovered, it could not be tested against the casings and fragments. Robinson's arguments concerning the potential usefulness of the casings and fragments to his defense amount to mere speculation.

¶57.   Additionally, the record contains no evidence that the casings and fragments were destroyed in bad faith.  "Bad faith, the third and final prong, is defined as 'not simply bad judgment or negligence, but rather . . . conscious doing of a wrong because of dishonest purpose or moral obliquity[.]'" *Murray v. State*, 849 So. 2d 1281, 1286 (Miss. 2003) (quoting *Black's Law Dictionary* 139 (6th ed. 1990)). A due-process violation occurs only

"where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth." ***Tolbert v. State***, 511 So. 2d 1368, 1372 (Miss. 1987) (citing ***Washington v. State***, 478 So. 2d 1028, 1032-33 (Miss. 1985)). Detective Savage testified at trial that the casings and fragments were discarded inadvertently during a major reorganization of the police department's evidence room. Accordingly, the record indicates that the loss of this evidence was the result of, at most, carelessness on the part of the police department. This argument is without merit.

### IX. Whether the State knowingly introduced false, incompetent, and inflammatory evidence, resulting in an unfair trial.

¶58. Robinson presents several separate assignments of error in which he accuses State witnesses of providing false testimony at his trial.[13] These accusations are based primarily on inconsistencies in the witnesses' testimonies, and Robinson interprets these inconsistencies as proof that the State's witnesses were lying on the stand. For example, Robinson points out that Officer Jefferson's testimony and Carmen Thompson's testimony conflict on whether Thompson spoke to the police on the night of the shooting. On a similar note, Detective Savage and Darius Wright had different recollections of the timing of their meeting, during which Wright identified Robinson as the shooter. Detective Savage also testified that he took photographs of the crime scene, but his report indicates that another police officer took the photos. Robinson claims that Jonathan Woods gave conflicting testimony about whether the front door of the Creme De La Creme was open or closed when the shooting started and whether he could see the shooter. And finally, Darius Wright and

---

[13] These issues are set out in Sections VI, VII, VIII, and X of Robinson's pro se brief.

Carmen Thompson provided conflicting testimony on whether Thompson had fired her gun at the shooter. Robinson contends that this alleged false testimony resulted in the denial of his right to a fair trial.

¶59. The prosecution violates the defendant's rights under the Fourteenth Amendment to the United States Constitution when it knowingly presents false evidence or allows it to go uncorrected when it appears. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S. Ct. 340, 342, 79 L. Ed. 791 (1935). To prove such a violation, the defendant must first demonstrate that a prosecution witness knowingly provided false testimony. *Havard v. State*, 86 So. 3d 896, 901 (Miss. 2012). *See also Howell v. State*, 163 So. 3d 240, 252 (Miss. 2014) ("Howell did not present any evidence that Grisham intentionally lied or that the State knew that an attorney was not present at the lineup."). And even if the defendant meets this burden, a new trial is required only if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." *Napue*, 360 U.S. at 271.

¶60. After reviewing Robinson's various allegations of false testimony, we find that Robinson has failed to demonstrate that any of the State's witnesses intentionally lied on the stand. Robinson simply points out inconsistencies in the witnesses' testimonies, and "[w]hen asked to reverse on the ground of inconsistencies or contradictions in testimony, we have held this is clearly in the jury's province and refused." *Turner v. State*, 818 So. 2d 1181, 1185 (Miss. 2002). "Jurors are permitted, indeed have the duty, to resolve the conflicts in testimony they hear. It is enough that the conflicting evidence presented a factual dispute for

34

jury resolution." ***Groseclose v. State***, 440 So. 2d 297, 300 (Miss. 1983) (quoting ***Gandy v. State***, 373 So. 2d 1042, 1045 (Miss. 1979)).  Furthermore, we have considered the testimony cited by Robinson and conclude that it was not material to the outcome of the case. Accordingly, this argument is without merit.

### X.   Whether the trial court erred in limiting Robinson's cross-examination of Damion Kimble.

¶61.   Robinson argues that the trial court erred in prohibiting him from cross-examining Damion Kimble about a sexual-assault charge that was pending against Kimble at the time of trial.   Robinson alleges that Kimble made a deal with the State in exchange for his testimony in this case and that the exclusion of evidence of Kimble's pending criminal charge prevented the jury from considering his interest in testifying for the State.   This argument is without merit for two reasons.   First, while the State did file a motion in limine seeking to prevent Robinson from admitting evidence of Kimble's pending criminal charge, the trial court never ruled on that motion.[14]   Accordingly, contrary to Robinson's assertion, the trial court did not limit his right to cross-examine Kimble.   Robinson simply failed to raise the issue during trial. Notwithstanding this fact, the record contains no evidence that Kimble had received or would receive favorable treatment from the State in exchange for his testimony. Accordingly, similarly to the evidence of Wright's guilty plea discussed above, Kimble's criminal charge was not relevant to his interest in testifying.

---

[14] At the hearing on the State's motion in limine, it was revealed that Kimble's attorney worked for the same law firm as one of Robinson's attorneys. The trial court passed on considering the State's motion in limine in order to resolve this conflict of interest. Robinson's conflicted attorney was excused from the case, and the hearing concluded without the trial court ruling on the State's motion.

**XI.** **Whether the State violated Robinson's right to a fair trial by supplying false information during closing arguments.**

¶62. In the final assignment of error in his pro se brief, Robinson claims that the prosecutor incorrectly stated during closing argument that Jessica Woods identified him as the shooter. He claims that Jessica never identified him during her testimony and that the prosecutor's comment provided false information to the jury and violated his due-process rights. Because Robinson failed to object to the prosecutor's comment at trial, this argument is procedurally barred. *Cole*, 525 So. 2d at 369. Notwithstanding the procedural bar, this argument is without merit. Robinson's characterizations of the prosecutor's comment and Jessica's testimony are incorrect. Jessica testified that the shooter was the same man who had been kicked out of the club earlier in the night in question. During closing arguments, while commenting on Robinson's theory that the State's witnesses were conspiring against him, the prosecutor stated, "[H]ow does Jessica Woods say the same guy who was kicked out of the club was the shooter when she was in surgery fighting for her life in and out of consciousness? How did she get her story straight with everybody else? Doesn't make sense." Contrary to Robinson's assertion, the prosecutor did not incorrectly state that Jessica had identified Robinson specifically as the shooter..

## CONCLUSION

¶63. For the foregoing reasons, we affirm Robinson's convictions and sentences.

¶64. **AFFIRMED.**

**RANDOLPH, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶65.    I respectfully dissent. Jury Instruction S-14A erroneously singled out the identification testimony of Darius Wright and amounted to a comment on the quality and weight of his testimony. Additionally, the prosecutor used Robinson's exercise of his right to remain silent to impeach his trial testimony about his whereabouts at the time of the shooting, constituting plain error. Because of these errors, I would reverse and remand for a new trial.

*I. Jury Instruction*

¶66.    At the trial, it was undisputed that, during the early morning hours of March 6, 2011, someone fired multiple gunshots toward the entrance of the Creme de La Creme nightclub in Moss Point, Mississippi. The critical question was whether that person was Robinson. Darius Wright and several other witnesses identified Robinson as the culprit. But Wright was the only eyewitness to the shooting who had known Robinson before that night, having grown up with him in the Moss Point area. The State requested, and the trial court granted, Instruction S-14A, that provided the following:

> The Court instructs the jury that the burden is on the State to prove beyond a reasonable doubt that the offense was committed and that the defendant was the person who committed it. You have heard evidence regarding the identification of the defendant as the person who committed the crime. In this connection you should consider the witness's opportunity to observe the criminal act and the person committing it, including the length of time the witness had to observe the person committing the crime, the witness's state of mind, and any other circumstances surrounding the event. You should also consider the witness's certainty or lack of certainty, the accuracy of any prior description, and the witness's credibility or lack of credibility, as well as any other factor surrounding the identification. *You have heard evidence during the trial that the witness, Darius Wright, identified the defendant.*

37

*The identification of the defendant by a single eyewitness, as the person who committed the crime, if believed beyond a reasonable doubt, can be enough evidence to convict the defendant.*

It is for you to determine the reliability of any identification and give it the weight it deserves.

(Emphasis added.) Instruction S-14A reminded the jury that Darius Wright had identified the defendant and that, if it believed his identification of the defendant as the shooter beyond a reasonable doubt, it could convict. Robinson argues that Instruction S-14A was erroneous because it emphasized the evidence that Wright in particular had identified him as the culprit.

¶67. "The judge in any criminal cause, shall not sum up or comment on the testimony, or charge the jury as to the weight of evidence . . . ." Miss. Code Ann. § 99-17-35 (Rev. 2015). A jury instruction should not be given if it singles out certain evidence in a manner amounting to a comment on the weight of the evidence. *Manuel v. State*, 667 So. 2d 590, 592 (Miss. 1995). A jury instruction also should not comment on the quality of the evidence. *Howell v. State*, 860 So. 2d 704, 745 (Miss. 2003). On appellate review, this Court reads jury instructions as a whole, and if the instructions fairly announce the applicable law and create no injustice, we will find no reversible error. *Davis v. State*, 18 So. 3d 842, 847 (Miss. 2009). But if the trial court abused its discretion by granting an erroneous jury instruction, we will not hesitate to reverse. *Moody v. State*, 202 So. 3d 1235, 1236-37 (Miss. 2016).

¶68. The majority recognizes that error occurs if a jury instruction draws attention to a particular part of the evidence adduced at trial in a way that comments on its weight. Yet the majority finds that Instruction S-14A did no such thing. Certainly, the jury instruction told the jury to weigh the reliability of any identification and give it the weight it believed it

deserved. And the jury instruction did not specifically say that the jury should convict if it believed Wright's testimony without assessing the other evidence. But the flawed jury instruction was not cured by those attributes. The problem with Instruction S-14A was that, although there were numerous eyewitnesses to the shooting, it focused the jury's attention on the State's strongest eyewitness, Darius Wright, the only eyewitness who previously had known Robinson. Every other eyewitnesses said that he or she had not known Robinson before the shooting, but that the shooter was the same person who had been thrown out of the club earlier that night and identified as Robinson. While it was permissible to instruct the jury on the law that the identification testimony of a single eyewitness, if believed beyond a reasonable doubt, was sufficient to convict, it was impermissible for the instruction to suggest that the most believable witness was the State's strongest witness, Wright. I would find that Instruction S-14A commented on the weight and quality of the evidence, and that the trial court abused its discretion by granting it.

¶69.    I observe that it is beyond question that both the State and the defense viewed the Instruction S-14A as a suggestion that the jury should find Wright's testimony to be especially weighty. At the jury instruction conference, defense counsel objected to the instruction on the basis that it singled out Wright from the group of eyewitnesses. Defense counsel said the instruction "would seem right to me if it wasn't for singling out Darius Wright. I mean, four [other] people up there basically identified him." The trial court's response indicated its view that the instruction's singling out Wright was a feature, not a problem: "the case hinges on the identification by Darius Wright. That's in evidence. . . . *It*

*just focuses the jury's attention on that witness*." (Emphasis added.) The trial court overruled the objection. Of course, the judge should not be in the business of focusing the jury's attention on this or any other portion of the evidence.

¶70. During closing arguments, the prosecutor twice drew the jury's attention to Instruction S-14A:

> Ladies and gentlemen, we have eye witnesses as I said. I'll bring your attention to this jury instruction. Here you go, ladies and gentlemen. The identification of a defendant by a single eye witness as a person who committed the crime, if believed beyond a reasonable doubt, can be enough evidence to convict. I submit to you, Darius Wright, he identifies him.
>
> . . .
>
> Now, if this was just – if I had just brought Darius Wright in here and that was the only witness y'all heard from, I'd still be telling you that if you believe him that's proof beyond a reasonable doubt because it is. Ms. Van Buskirk showed you the instruction.

I find that Instruction S-14A was intended to be, and operated as, a judicial comment on the weight and quality of Darius Wright's testimony. Because the instruction erroneously placed undue emphasis upon the testimony of the State's strongest witness, Robinson's jury was improperly instructed, and I would reverse and remand for a new trial.

### II. The State's Comment on Robinson's Post-**Miranda** Silence

¶71. After Robinson's arrest, the police read him his **Miranda**[15] rights and he invoked his right to remain silent. Thus, Robinson exercised that constitutional right and never spoke to the police about his activities on the night of the shooting. At trial, Robinson testified on direct examination that he had left the club before the shooting and then had traveled to

---

[15] **Miranda v. Arizona**, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Mobile, Alabama. On cross-examination, the prosecutor questioned Robinson about that testimony:

Q. I got one more question. That whole thing about Mobile and you not being there?

A. Yes, sir.

Q. First time that's ever been told is to this jury, isn't it?

A. Okay; yes, sir.

Defense counsel did not object to this question. On appeal, Robinson argues that the prosecutor's question constituted a plain error because it was an unconstitutional comment on his exercise of the right to remain silent.

¶72. The right to remain silent and against self-incrimination is guaranteed by the federal and state constitutions. U.S. Const Amend. V; Miss. Const. Art. 3, § 26. The United States Supreme Court has condemned, as a violation of due process, the government's use of an accused's exercise of the right to remain silent to impeach his trial testimony. *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). "[I]n *Doyle* the U.S. Supreme Court held that if an accused under arrest was given a *Miranda* warning and told that he had a right to remain silent, and the accused did remain silent, that the government thereafter could not use his choice of remaining silent as a weapon during his trial testimony cross-examination to cast suspicion on his guilt or innocence." *Puckett v. State*, 737 So. 2d 322, 350 (Miss. 1999). The State is not allowed to use the exercise of a constitutional right by the accused as "a weapon to convict him." *Id.*

¶73.    In *Emery v. State*, 869 So. 2d 405, 406 (Miss. 2004), the prosecutor elicited testimony on cross-examination about the defendant's whereabouts on the night of the crime. Because the defendant had not offered an alibi defense, the State was the only party to elicit the defendant's testimony about his whereabouts. *Id.* at 407. After the defendant explained where he had been, the prosecutor asked "And this is the first time that you have ever made that statement or told that story, isn't it?" and "In over a year's time since you've been arrested, this is the first time that you've told that story; isn't that correct?" *Id.* The defendant replied that, upon arrest, he had asked for a lawyer instead of talking to the police. *Id.* During closing arguments, the prosecutor used the defendant's testimony to argue: "Okay, there ain't nothing about this going to Leland to a barbecue stuff. Folks right there, you can tattoo 'liar' right across his forehead because that's what he did. He took that stand and he lied to you." *Id.* Thus, the prosecutor elicited alibi testimony from the defendant on cross-examination, then used the defendant's prior exercise of the right to remain silent to impeach the alibi testimony. *Id.*

¶74.    The Court found that the issue was "whether the trial court committed reversible error by allowing the prosecutor to imply to the jury that Emery's post-arrest silence was an indication that he was untruthful and, by implication, an indication that he committed the crime." *Id.* at 408. The Court emphasized that the issue was not one of first impression because it had been decided almost thirty years previously in *Doyle*. *Id.* at 408-09. *Doyle* held that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at

408 (quoting *Doyle*, 426 U.S. at 619, 96 S. Ct. 2240). The Court also recognized that, in *Quick v. State*, 569 So. 2d 1197, 1199 (Miss. 1990), we held that "[i]t is improper and ordinarily, reversible error to comment on the accused's post-*Miranda* silence." *Id.* at 408. Because the trial court improperly had permitted the prosecutor to use Emery's post-*Miranda* silence to impeach his trial testimony, in violation of *Doyle*, the Court reversed and remanded for a new trial. *Id.* at 410.

¶75. This case bears a striking resemblance to *Emery*. As in *Emery*, the prosecution impeached Robinson by eliciting his admission that the trial was the first time he had spoken about his whereabouts on the night of the crime. Because Robinson had exercised his right to remain silent, the prosecutor's use of his post-*Miranda* silence to impeach him and imply his guilt violated Robinson's federal and state constitutional due process rights. Further, considering the error in light of this Court's admonition in *Emery* that the law had been established for almost thirty years at the time of the decision, and that "[w]e would expect that this cross-examination technique employed by the prosecutor, and allowed by the trial court, would cease," I find that the error here was a plain, clear, and obvious one. Because the error violated Robinson's fundamental due process rights, resulting in a manifest miscarriage of justice, I would reverse. *See* M.R.A.P. 28(a)(3) (when a defendant's substantive or fundamental rights are affected, this Court will notice "a plain error not identified or distinctly specified."); *Cozart v. State*, 226 So. 3d 574, 581 (Miss. 2017) (plain-error analysis requires "a determination of whether there is an error that is some deviation

43

from a legal rule, whether that error is plain, clear or obvious, and whether the error is prejudicial in its effect upon the outcome of the trial court proceedings.").

¶76.    The majority finds *Emery* distinguishable from this case because, unlike the defendant in *Emery*, Robinson offered an alibi defense at trial by testifying on direct examination that he had left the club before the shooting, bound for Mobile. The majority concludes that this distinction is critical because, pursuant to Uniform Rule of Circuit and County Court Practice 9.05, Robinson was supposed to have disclosed any alibi defense to the State upon demand:

> Upon the written demand of the prosecuting attorney . . . the defendant shall serve within ten days . . . upon the prosecuting attorney a written notice of the intention to offer a defense of alibi, which notice shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon which the defendant intends to rely to establish such alibi.

URCCC 9.05. Although the State demanded notice of Robinson's intent to offer an alibi defense, Robinson never responded. Therefore, the State's first notice of his alibi defense was at the trial.

¶77.    The majority concludes that, because Robinson violated Rule 9.05 by failing to provide the State with notice of his alibi defense, "the prosecutor's question to Robinson about the novelty of his alibi defense [was] a comment on his failure to comply with a discovery rule rather than an attempt to attack the credibility of his testimony." But Robinson's failure to provide the State notice of his alibi defense was a purely procedural matter not relevant to the jury's determination of Robinson's guilt or innocence. It had no tendency to make Robinson's guilt, or any fact of consequence in the case, more or less probable. *See* M.R.E. 401(a). Therefore, trial testimony on the matter was immaterial and

irrelevant. *See* M.R.E. 402 ("[i]rrelevant evidence is not admissible"). If the prosecutor had a problem with Robinson's offering an alibi defense due to his noncompliance with the discovery rule, the appropriate action would have been to inform the trial judge, not raise the matter before the jury. There was no reason for the prosecutor to have elicited testimony about it, because such testimony was irrelevant to anything properly before the jury, and it was inadmissible. The notion that the prosecutor's question was an inquiry into Robinson's noncompliance with Rule 9.05, rather than an attempt to cast suspicion on him due to his exercise of the right to remain silent, strains credulity.

¶78.    The majority errs by deciding that the prosecutor's question was a comment on the irrelevant matter of Robinson's compliance with Rule 9.05, rather than a relevant, but impermissible, comment on his exercise of the right to remain silent. Even assuming *arguendo* that the defendant's failure to give the State timely notice of an alibi defense could have been a relevant jury issue in this case, no instruction was given to the jury to inform it of the existence of Rule 9.05 or to explain the relevance of the fact that Robinson's defense counsel had failed to comply with it. Nor was any limiting instruction given to the jury to consider Robinson's testimony for its tendency to show the Rule 9.05 violation as opposed to the unconstitutional purpose of impeaching his exercise of the right to remain silent.

¶79.    As the majority notes, a prosecutor's comment on the defendant's post-*Miranda* silence has been found to be harmless error when there was overwhelming evidence of the defendant's guilt. *Emery*, 869 So. 2d at 409. I would decline to deem the error in this case harmless. No physical evidence such as DNA or fingerprints linked Robinson with the crime.

The weapon used in the shooting never was recovered, and the State did not prove that Robinson owned or had access to a gun. Robinson never confessed. The State's case rested solely upon the identification testimony of eyewitnesses whose impressions were formed in the chaotic atmosphere of a nightclub shooting. Therefore, the evidence of guilt was not overwhelming, rendering the prosecutor's insinuation that Robinson had concocted an alibi for the trial especially damaging. I would find that the prosecutor's impeachment of Robinson's alibi testimony with the evidence that he had exercised his right to remain silent was a plain error demanding that this Court reverse and remand for a new trial.

*Conclusion*

¶80.    Two significant errors occurred in this case. Instruction S-14A singled out the identification testimony of Darius Wright for special attention by the jury, constituting an improper comment on the quality and weight of the evidence. And a plain error occurred when the prosecutor used Robinson's post-***Miranda*** silence to impeach his trial testimony that he was traveling to Mobile at the time of the shooting. Because these two errors should not be allowed to stand, I would reverse and remand for a new trial.

**KING, J., JOINS THIS OPINION.**

46