# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00616-COA

**NORMAN WHIDDON, JR.**                                        **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                        **APPELLEE**

DATE OF JUDGMENT:                04/28/2022
TRIAL JUDGE:                     HON. PRENTISS GREENE HARRELL
COURT FROM WHICH APPEALED:       LAMAR COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          HERBERT H. KLEIN
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:               HALDON J. KITTRELL
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     AFFIRMED - 04/30/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1. Pursuant to a multi-count indictment, a Lamar County Circuit Court jury found Norman Whiddon Jr. guilty of the following charges: Count I, first-degree murder; Count II, aggravated assault with a deadly weapon; Count III, aggravated assault of a law enforcement officer; and Count IV, fleeing a law enforcement officer. The Lamar County Circuit Court sentenced Whiddon to life imprisonment for Count I; to twenty years for Count II; to thirty years for Count III; and to five years for Count IV, with all sentences to be served concurrently with one another in the custody of the Mississippi Department of Corrections (MDOC). In addition, the circuit court fined Whiddon a total of $30,000.

¶2. On appeal from his convictions and sentences, Whiddon argues (1) the circuit court erred by failing to dismiss his case for lack of a speedy trial; (2) the circuit court erred by excluding three videotaped statements from unavailable declarants; (3) the circuit court judge improperly commented on the lead investigator; (4) the circuit court gave an improper jury instruction; (5) there was insufficient evidence to support his conviction for first-degree murder; and (6) the jury's guilty verdict for first-degree murder was against the overwhelming weight of the evidence.

¶3. Upon review, we conclude that the circuit court erred by excluding the three videotaped statements from unavailable declarants that Whiddon attempted to admit into evidence. In light of the overwhelming evidence against Whiddon, however, we further conclude that the error was harmless. Finding no reversible error, we affirm Whiddon's convictions and sentences.

**FACTS**

¶4. On April 13, 2019, law enforcement responded to multiple 911 calls about gunshots fired at a residence in Lamar County, Mississippi. The callers informed the 911 dispatcher that Whiddon had shot and killed Jamie Herrin and had injured Jamie's girlfriend April Robb. Whiddon fled the scene of the shooting in his truck, and law enforcement officers pursued him. The pursuit ended after Whiddon's truck collided with an approaching patrol vehicle. That same day, Whiddon was arrested and charged. Due to the nature of the charges against Whiddon, the circuit judge denied his request to set bail.

¶5. Almost a year later, on April 6, 2020, Whiddon filed a petition for writ of habeas

2

corpus in which he raised issues regarding the alleged lack of an indictment against him and failure to provide him with a speedy trial. The circuit judge converted Whiddon's petition into a request for a bond hearing and allowed both parties to present arguments as to whether Whiddon should continue to be denied bail. Although finding that Whiddon should remain "no bonded," the circuit judge provided that he would periodically review Whiddon's bond status in accordance with the Mississippi Rules of Criminal Procedure.

¶6.     Two months after filing his petition for writ of habeas corpus, Whiddon filed a motion on June 22, 2020, to dismiss for lack of a speedy trial. After weighing the factors established in *Barker v. Wingo*, 407 U.S. 514 (1972), for claims of speedy-trial violations, the circuit judge concluded that Whiddon's right to a speedy trial had not been violated. The circuit judge therefore denied Whiddon's motion.

¶7.     On September 2, 2020, a grand jury indicted Whiddon for first-degree murder, aggravated assault with a deadly weapon, aggravated assault of a law enforcement officer, and fleeing a law enforcement officer. Following his arraignment on September 14, 2020, Whiddon's trial was scheduled for April 5, 2021.

¶8.     Prior to his trial, Whiddon filed a second motion to dismiss for lack of a speedy trial on March 15, 2021. On March 26, 2021, the circuit judge held a hearing to rule on Whiddon's motion and to consider arguments as to whether Whiddon should be granted bail. That same day, the circuit judge signed an order, which was entered the next day, granting Whiddon bail and providing that Whiddon "be released on his own recognizance pending final disposition of the charges [against him]" and "upon [his] compliance with certain

enumerated conditions of release." Also on March 26, 2021, the circuit judge signed a sua sponte order to continue Whiddon's trial for good cause due to the unavailability of one of the State's key witnesses. The order was entered on March 31, 2021, and the circuit judge rescheduled Whiddon's trial for August 9, 2021.

¶9. On July 28, 2021, the circuit court entered an order denying Whiddon's second motion to dismiss. The circuit judge found that although "there has been a delay in bringing [Whiddon] to trial, [Whiddon] has not been prejudiced[,] and the reasons for the delay do not warrant a dismissal for failure to provide a speedy trial." Based on the circuit judge's analysis of the *Barker* factors, he concluded that Whiddon's right to a speedy trial had not been violated.

¶10. On August 3, 2021, the circuit court entered another order continuing Whiddon's trial. The circuit judge noted that "a number of the witnesses and court personnel involved in this case have either tested positive for COVID-19 or . . . been exposed to the virus . . . ." Due to the exposure, the circuit judge once again continued Whiddon's trial for good cause and rescheduled the matter for April 2022.

¶11. Whiddon's jury trial began on April 11, 2022, and spanned four days. The jury heard testimony that around 8:54 p.m. on April 13, 2019, the Lamar County emergency dispatcher received multiple 911 phone calls about gunshots being fired outside a local residence. Law enforcement officers arrived at the scene at 9:14 p.m. Deputy Brian Ford with the Lamar County Sheriff's Department testified that he arrived at the scene first. Upon his arrival, Deputy Ford encountered Cody Sumrall, who reported that his uncle's girlfriend April had

4

been shot. Deputy Ford observed April standing by the porch of a nearby mobile home with her arm wrapped in a towel. Deputy Ford inspected April's injured arm and then wrapped the towel back around her arm. Cody informed Deputy Ford that his uncle, Jamie, had also been shot, and Cody led Deputy Ford to where Jamie's body was lying on the ground. Deputy Ford noted that Jamie, who was deceased, had sustained injuries to his head.

¶12. Deputy Ford looked inside the mobile home Jamie and April had occupied. He observed bullet holes in the side and interior of the residence as well as blood on the floor of the mobile home. Also inside the mobile home, Deputy Ford found several guns and knives. Stuffed between the couch and the wall of the mobile home, Deputy Ford found a sawed-off shotgun. Because possession of a sawed-off shotgun is illegal, Deputy Ford seized the item. When Investigator Michael Wahl with the Lamar County Sheriff's Department arrived at the scene, he took over the investigation, and Deputy Ford had no further involvement in the matter.

¶13. Investigator Wahl testified that during his investigation, he learned that Whiddon and Jamie had been friends for a long time. On a date prior to the shooting, a fight had occurred at a birthday party that resulted in injury to Whiddon. Investigator Wahl learned that Whiddon apparently had blamed Jamie for the incident, which "[s]omehow . . . led up to the shooting." The witnesses at the crime scene informed Investigator Wahl that on the night of the shooting, Whiddon had come to the scene two separate times and fired gunshots both times. After the second time Whiddon arrived and fired gunshots, he left, and responding law enforcement officers pursued him. After interviewing the witnesses at the scene,

5

Investigator Wahl performed a walk-through of the crime scene, which he videotaped. The circuit judge admitted Investigator Wahl's videotaped walk-through and crime-scene photos into evidence, and the State played the video for the jury during Investigator Wahl's direct examination.

¶14. Other than Jamie's fatal injuries, Investigator Wahl testified that April was the only other person at the crime scene who had been shot and was bleeding. Just like Deputy Ford, Investigator Wahl observed the blood on the floor of the mobile home that Jamie and April had occupied. Also inside the mobile home, Investigator Wahl saw knives and two guns hanging on the wall. Investigator Wahl testified that the weapons were not collected as evidence during the investigation because law enforcement determined the guns had not been fired and the weapons were not used during the commission of the crime. According to Investigator Wahl, April's arm was so mangled and was bleeding so badly that if she had taken a gun from the wall, "there would have been blood along the wall if she would have tried to put one of those guns back." Investigator Wahl further stated that he did not think April could have successfully placed a gun back on the wall due to the condition of her arm.

¶15. Investigator Wahl confirmed that Deputy Ford had collected a sawed-off shotgun from behind the couch inside the mobile home and that possession of such a weapon is illegal. Investigator Wahl further confirmed, however, that like the other weapons found inside the mobile home, he determined during the course of his investigation that the sawed-off shotgun had played no role in the commission of the crime at issue.

¶16. Investigator Wahl testified that on the night of the shooting, there was "a severe

6

thunderstorm warning" in effect, and it had been "raining good that night" as he drove to the crime scene. Investigator Wahl corroborated Deputy Ford's testimony that despite the wet ground, there was no water visible on the floor inside the mobile home. Moreover, Investigator Wahl stated that he saw nothing "wet or dirty" inside the mobile home that would indicate someone had exited and then re-entered the mobile home after the rain had begun.

¶17.     Investigator Wahl testified that he did not see or speak to Whiddon on the night of the shooting. By the time Investigator Wahl arrived at the crime scene, Whiddon had fled, and other law enforcement officers were in pursuit of Whiddon's vehicle. The pursuit ended when Whiddon's vehicle collided with an oncoming law enforcement vehicle. Investigator Wahl testified that Whiddon was transported to the hospital for treatment. Whiddon's medical records identified drug abuse, including methamphetamine abuse, as an issue noted upon his hospital admittance. According to the medical records, Whiddon confirmed to medical personnel that he had used methamphetamine prior to his hospital admittance.

¶18.     Although law enforcement recovered no shell casings, bullets, or bullet fragments at the crime scene, Investigator Wahl testified that they collected two guns and a box of ammunition from Whiddon's possession after his arrest. They also collected six spent shell casings from inside one of Whiddon's guns. Investigator Wahl further testified that law enforcement collected unspent shotgun shells from inside a pocket of Whiddon's clothing. In addition, medical personnel who treated April at the hospital recovered a bullet fragment from her body and turned the fragment over to law enforcement. The bullet fragment was

too small and mangled, however, for any analysis to be performed on it.

¶19.    Investigator Wahl testified that while Whiddon was in the county jail awaiting his trial, Whiddon had "access to telephone, video visitation[,] and an email system that is set up." Investigator Wahl stated that inmates were informed that authorities monitored and recorded incoming and outgoing phone calls and messages. As an investigator with the sheriff's department, Investigator Wahl had the ability to access all of Whiddon's communications. Investigator Wahl testified that he reviewed several of Whiddon's email and video communications in which Whiddon had provided details about the shooting.

¶20.    After the circuit court admitted the emails into evidence, Investigator Wahl read their contents to the jury. In Whiddon's email to his sister on June 4, 2019, he described his conversation with their father during a video visit earlier that same day. Whiddon wrote,

> I told him [(dad)] a little about why I did what I did and probably was recorded and will be used against me, but at this point, I don't care. I did it[,] and I'm man enough to own up to it. Jamie was my best friend, but I didn't agree with what he was doing[,] and I thought I was doing the right thing. He had been trying to recruit me into the [Aryan B]rotherhood[,] and I wouldn't do it. . . . I, myself, was buying drugs from Jamie[,] and I think that last I got was bad[,] and it caused me to go past the breaking point . . . .

¶21.    In an email sent to his sister on July 13, 2019, Whiddon stated that he "didn't kill Jamie." He further stated in the same email, however, that when he arrived at Jamie's residence, "Jamie ran up to my truck[,] and when he went to reach in my truck, all I did was defend myself." In a third email sent to his former girlfriend, Rebecca Gibson, on July 26, 2019, Whiddon admitted to using methamphetamine, arriving at Jamie's residence, leaving, returning to Jamie's residence a second time, and observing Jamie's dead body on the ground

by Jamie's truck. Finally, in an email sent to his sister on July 28, 2019, Whiddon stated, "I shot in self-defense with my pistol when he [(Jamie)] reached into the window of my truck and tried to pull me out of the window." Investigator Wahl testified that at no point in the emails did Whiddon claim he saw Jamie or anyone else present with a weapon.

¶22. The State also introduced into evidence two of Whiddon's recorded-video visits. Investigator Wahl explained that the first recorded visit occurred on May 28, 2019, with Whiddon's father and that the second recorded visit occurred on June 18, 2019, with one of Whiddon's friends. In the recorded-video visits, Whiddon never claimed that he acted in self-defense when he shot Jamie or that anyone else present at the time of the shooting had a weapon. Instead, Whiddon claimed that he was "protecting children" when he shot Jamie, and he stated that he would shoot Jamie again.

¶23. On cross-examination, the defense attorney questioned Investigator Wahl about three inmate affidavits the defense had provided to him and the four recorded interviews he had conducted during his follow-up investigation. Despite the State's objection to the line of questioning, the circuit judge allowed Whiddon's attorney to ask Investigator Wahl about the three inmate affidavits and the four interviews he had conducted after receiving the affidavits. Testimony from the three affidavits alleged that the three inmates referenced—Justin Anderson, Jason Crutchfield, and JuJuan Walker—had all been present when Cody admitted that he, and not Whiddon, had shot Jamie. Two of the inmates, Anderson and Crutchfield, maintained during their recorded interviews with Investigator Wahl that they had heard Cody admit to killing Jamie. Walker, however, recanted the

9

statement in his affidavit when Investigator Wahl interviewed him, and he stated that someone else had actually told him about Cody's alleged admission. While investigating the three inmates' affidavits, Investigator Wahl learned about a fourth inmate, Matthew Jackson, who stated in his subsequent interview that he also had heard Cody admit to shooting Jamie. Jackson said he and Cody would get high together and that Cody would ramble. According to Jackson, he heard Cody state during one such ramble that he (Cody) had accidentally shot and killed Jamie. Jackson further stated, however, that at another time he had heard Cody deny shooting Jamie.

¶24. After interviewing these four inmates, Investigator Wahl also interviewed Cody, who denied ever stating that he had killed Jamie. Investigator Wahl stated that during his interview with Cody, he learned for the first time there might be home-surveillance footage of the shooting that he could review. Cody's mother Gina Mann and his stepfather Michael Mann lived across the street from Jamie and April's residence. The Manns had been home at the time of the shooting and had given their statements to law enforcement. Once Investigator Wahl learned from Cody that the Manns might be able to provide video footage of the shooting, he allowed Cody to call the Manns. Investigator Wahl testified that he remained present as Cody made the phone call and arranged for the Manns to provide any relevant video footage they might have.

¶25. On July 1, 2021, the Manns gave Investigator Wahl two computer hard drives that linked to their home's security system, but the sheriff's department was unable to recover any recordings from either hard drive. Investigator Wahl testified that Jamie and April's mobile

10

home had an exterior camera that provided a live feed but no recorded surveillance footage. Thus, despite his best efforts, Investigator Wahl stated that he was unable to ever view any video recordings of the shooting.

¶26. The State also called April to testify. April stated that she had known Jamie for a long time but had only met Whiddon more recently through Jamie. April testified that Jamie and Whiddon had been good friends and had spent a lot of time together. April admitted that she, Jamie, Whiddon, and Rebecca (Whiddon's girlfriend at the time) had sometimes used methamphetamine together. April further admitted that she was high on methamphetamine at the time of the shooting.

¶27. On the day of the shooting, one of Jamie's nephews, Shawn,[1] planned to go to the school dance with Rebecca's daughter. When April and Jamie arrived at Whiddon and Rebecca's residence, they found Whiddon sitting on the couch. April testified that Whiddon's face was red, he had his head down, and he had a handgun. Whenever Whiddon acted like that, April stated that Rebecca would call Jamie. Jamie would then arrive to talk to Whiddon and help him calm down. April stated that on that particular day, however, when Jamie approached and asked how Whiddon was doing, Whiddon replied, "All I know is there is a boot print on the back of my head[,] and it's got your name on it. Get out of my house." April asked Rebecca how long Whiddon had been acting like that, and Rebecca told her "for a while."

---

[1] The trial transcript alternately uses the spelling "Shawn" or "Sean" to refer to the same individual. For the sake of clarity, we use the spelling "Shawn" throughout our opinion.

¶28. April testified that she thought Whiddon's comment about the "boot print" referred to an incident that had happened during a birthday party for Rebecca's grandchild. April could not recall exactly how much time had elapsed between the birthday party and Jamie's shooting. She believed, however, that the birthday party had occurred before the month of April, and Jamie's death did not occur until April 13. She stated that Whiddon had asked Jamie to attend the birthday party because Whiddon did not get along with the boyfriend of Rebecca's eldest daughter. April explained that Whiddon had previously had a confrontation with the boyfriend and wanted Jamie to "have his back" in case another confrontation occurred at the birthday party. April and Jamie attended the birthday party, and April testified that Whiddon got into a fight with the boyfriend of Rebecca's eldest daughter. April stated that before Jamie could intervene to help Whiddon, a third person "stepped up and stomped on [Whiddon's] head . . . ." April testified that Whiddon had seemed to think that Jamie did not "ha[ve] his back" during the altercation and had been "disappointed" with Jamie as a result of the incident.

¶29. After testifying about her understanding of Whiddon's reference to "a boot print on the back of [his] head" with Jamie's "name on it[,]" April returned to the events that took place on the day of Jamie's shooting. After Whiddon told Jamie to leave his home, Jamie and April got into Jamie's truck and drove to their home. April testified that as they drove away from Whiddon and Rebecca's residence, she saw Whiddon standing outside with a gun pointed in their direction. When April relayed her observation to Jamie, he told her "to get down because there [was] no telling what [Whiddon] might do . . . ."

12

¶30. April testified that after she and Jamie returned home, Whiddon arrived in his truck and parked outside their mobile home. April watched on the camera monitor inside as Jamie and Cody walked outside. April testified that neither Jamie nor Cody held a weapon as they exited the mobile home. April watched on the live-feed monitor as Jamie approached Whiddon's truck. She testified that Jamie rested his forearms on the open driver's side window of the truck, but she never saw him try to reach into Whiddon's truck. April stated that she then heard a gunshot and ran to the front door of the mobile home. When she looked outside the front door, she saw Jamie and Cody running away from the truck. April testified that Jamie was holding and covering his face with his hands as he ran. April stated that she yelled, "[Whiddon], no." Whiddon then turned the gun he held toward her. As she shut the door to the mobile home, Whiddon fired his gun, and a bullet hit April in the arm. Although there were weapons on a nearby wall of the mobile home, April testified that she never thought to reach for one to defend herself. Instead, April grabbed a towel for her arm, crawled toward the bedroom, and remained curled in a ball on the floor as bullets tore through the walls of the mobile home.

¶31. Once everything outside became quiet, April exited the mobile home. While she was standing outside, Whiddon returned in his truck. April ran into a nearby shed and hid until she heard sirens from approaching police cars. April testified that she had sustained gunshot wounds to both her arm and her stomach and ended up with metal from the mobile-home door in her legs. During April's direct examination, the State and the defense stipulated on the record that due to her injuries, April "was not physically able and did not try to clean up

the scene" of the shooting before law enforcement arrived.

¶32. Jamie's brother-in-law Mike also testified about the shooting. At the time in question, Mike was sitting outside his house, which was located across the street from Jamie and April's residence, and was setting up a phone he had just purchased. Mike stated that a truck drove down the road and parked beside Jamie and April's mobile home. Mike identified Whiddon as the driver of the truck. As Mike watched, Jamie appeared at the door of his and April's mobile home. Speaking to Whiddon, who was still seated in his truck, Jamie said, "Hey, brother." Mike testified that he then heard gunfire and looked over to see "muzzle flash coming out of [Whiddon's] truck." Mike stated that he next saw Jamie completely exit the mobile home, run across the yard, and enter the shop building.

¶33. Mike first called 911 at 8:55 p.m. but then hung up to check on his family. He then called 911 again at 8:58 p.m. The jury listened to both 911 recordings. Mike testified that he saw Cody run toward the woods at the first sound of the gunfire. After shooting Jamie, Whiddon drove away. Mike testified, however, that Whiddon then returned. Mike told everyone to hide. He testified that he hid behind his truck in his driveway. Mike saw Whiddon stop in front of the shop building, and then he heard Whiddon "fire a couple of more rounds" before leaving again. Mike went to check on Jamie and found him lying on the ground in front of the shop. Mike testified that no one other than Whiddon had a gun at the time of the shooting.

¶34. Mike further testified that he had a video-surveillance system at his house that provided footage of not only his own driveway but also of the front of Jamie and April's

14

mobile home across the street. Mike testified that his surveillance system was working at the time of the shooting and that he watched the recording after the shooting. Mike stated that the video footage was on a computer hard drive that recorded over footage after a certain period of time had passed. Mike testified that he had tried to provide the video recording of the shooting to law enforcement officers, but he was not sure whether the footage had gotten recorded over or was lost by the time he did so. Despite his uncertainty, Mike stated that he had provided law enforcement with the hard drives in his possession in case the officers could recover and review the footage.

¶35. Gina, Mike's wife and Jamie's sister, testified that she was inside her home when she first heard the gunshots. After hearing the initial gunshots, Gina ran to the front door. Mike, who was standing outside in their driveway, told her to stay inside the house. After the first round of shooting had stopped, Gina ran across the road to her mother's residence, which was located next to Jamie and April's mobile home. As Gina was knocking on her mother's front door, April walked up with a towel on her arm and stated that Whiddon had shot her. Gina testified that her daughter Autumn also arrived on the front porch and handed Gina a cell phone. Autumn had been speaking with a 911 operator, but after learning that Mike was also on his phone with 911, Gina ended her call with 911.

¶36. Gina testified that Autumn left the front porch and began to run around the pump shed and to the front of the shop building. Gina heard Cody scream for Autumn not to go around that way, and from the tone of Cody's voice, Gina testified that she "knew there was something around [there] that Autumn didn't need to see." Gina stated that when she

15

reached Autumn, Autumn was standing there and looking down at Jamie, who was lying on the ground. Gina led Autumn back toward their home, but as they reached the roadway, they saw headlights coming their way. Gina stated that Mike yelled for everyone to hide because Whiddon might be returning. By the time Whiddon drove down the road, Autumn had reached the front door of the Manns' residence, and Gina had reached Mike's truck in the driveway. Gina testified that she heard Whiddon's truck stop again, and then she heard another gunshot.

¶37. Like Mike, Gina testified that their home-surveillance system recorded the shooting. Gina stated that she had started to watch the video with Mike, but after the first round of gunfire, she could not watch the rest of the recording. From the portion of the video that she watched, Gina testified that Jamie did not appear to have a weapon on him when he exited his mobile home. Gina stated that the video showed Jamie exit the mobile home and greet Whiddon. Gina also stated that she did not see either Cody or April in possession of a gun on the night of the shooting. Gina testified that she contacted law enforcement officers and notified them of the video recording. Gina stated that the Manns' video recording later disappeared but that she and Mike still turned over their hard drives to law enforcement officers. Gina testified that to her knowledge, the officers were unable to recover any video from the hard drives.

¶38. Cody testified that at the time of the shooting, he lived in a tiny home that he and Jamie had built beside Jamie and April's mobile home. Cody stated that he was inside Jamie and April's mobile home when Whiddon pulled up in his truck and parked. Cody testified

16

that he exited the mobile home so that Jamie could speak to Whiddon. Jamie exited the mobile home right behind Cody, and as Cody reached his tiny home, he heard multiple gunshots. Cody stated that neither he nor Jamie had a weapon as they exited the mobile home. Cody also stated that April had no weapon, and he had not heard any words exchanged between Whiddon and Jamie before the gunshots began.

¶39. Cody testified that he dove inside the tiny home once the shooting began. After the shooting stopped, Cody went back outside. Cody stated that Whiddon's truck was gone and that April was screaming, "Where is Jamie?" Cody testified that he discovered Jamie lying motionless on the ground in front of the shop building. As Cody and his family members gathered together around his grandmother's front porch, they saw headlights from an approaching vehicle. Cody testified that everyone then ran for cover and hid.

¶40. Cody stated that he ran toward the woods and called 911. The time recorded for the phone call was 9 p.m. The jury heard the audio from Cody's 911 call in which he told the dispatcher that Whiddon had returned and was shooting again. Cody testified that he had heard two shots after Whiddon's truck returned. Cody further testified that he had remained hidden in the woods until he saw the blue lights from arriving law enforcement vehicles.

¶41. During Cody's cross-examination, Whiddon's attorney questioned Cody about his imprisonment in the Lamar County Regional Jail in 2020 and 2021. Cody acknowledged that he had served time at the county prison, but he denied shooting Jamie or ever making self-inculpatory statements to other inmates. Whiddon's attorney asked whether Cody knew Anderson, Crutchfield, Jackson, and Walker. Cody stated that he had not known who the

17

men were until March 15, 2021, when Investigator Wahl arrived at the jail and questioned Cody about affidavits and recorded statements the four inmates had given regarding Cody and his alleged involvement in Jamie's shooting.

¶42.    At trial, Cody repeatedly denied any involvement in Jamie's shooting or ever making statements to other inmates in which he claimed responsibility for Jamie's shooting. Cody did acknowledge, however, that during his interview with Investigator Wahl on March 15, 2021, he had mentioned that Gina and Mike had a video recording of Jamie's shooting. Cody testified on cross-examination that he had volunteered during his interview with Investigator Wahl to call Gina and Mike to arrange for them to get law enforcement officials the video recording. Cody stated that he had not personally watched the video recording but had heard about the content of the video from other family members, such as Gina and Mike, who had viewed the recording themselves.

¶43.    The State also called Chris Hampton as a witness. Hampton testified that he had arrived at Jamie's residence on the evening of the shooting to deliver several truck tires to Jamie. When Hampton exited his truck, a man yelled that Jamie had just been killed. Hampton testified that he later learned the man was Jamie's brother-in-law Mike. Not knowing whether Mike's words were true, Hampton walked toward the shop building to find Jamie. Hampton stated that as he approached the shop building, he saw Jamie lying dead on the ground. Hampton testified that he saw a vehicle drive away and that he walked over to Mike, who stated he was speaking with a 911 operator. Hampton heard people begin to yell that "he was coming back, he was coming back," and he got into his own vehicle and used

it to block the roadway. Hampton stated that he had remained in his vehicle until law enforcement arrived. Once the officers arrived on the scene, Hampton saw Cody exit the woods and several girls exit a nearby shed. Hampton testified that he never saw any of Jamie's family members in possession of a weapon.

¶44. Officer Rob England with the Purvis Police Department testified that he was on duty the night of the shooting. After hearing that Whiddon's vehicle was headed his way and that another officer was ending his pursuit of Whiddon, Officer England observed Whiddon's truck pass his location at a high rate of speed. Officer England testified that he pulled behind Whiddon's truck and then turned on his siren and lights as he pursued Whiddon. Officer England stated that Whiddon continued driving at a rate of 85 to 90 miles per hour and had run through red lights and stop signs in his attempt to evade police. As other law enforcement officers joined the pursuit, Officer England testified that Whiddon had crossed over Interstate 59. Because he was unfamiliar with the roadway, Officer England slowed down to allow the officer behind him to pass him and lead the pursuit. When Officer England slowed down, Whiddon made a U-turn and headed back toward the officers. The lead officer managed to swerve and avoid Whiddon's oncoming truck. Although Officer England slowed to also avoid an accident, he testified that Whiddon had swerved into his traffic lane and struck his vehicle in a head-on collision. Officer England and other law enforcement officers exited their vehicles and held Whiddon at gunpoint until backup arrived and removed Whiddon from his truck.

¶45. After Whiddon had been arrested, the officers began collecting evidence from the

crash scene. They removed a camouflage mask and seven shotgun shells from Whiddon's pants pockets. They also discovered a rifle that appeared to have been ejected from Whiddon's truck as a result of the collision and a revolver lying on the truck's front passenger floorboard. The magazine inside the rifle had been emptied, and the cylinder inside the revolver contained six spent shell casings. Once the officers had Whiddon in custody, medical personnel tended to him. The jury heard testimony that Whiddon did not have any gunshot or knife wounds when examined by medical personnel.

¶46.    Dr. David Arboe, the forensic pathologist who performed Jamie's autopsy, confirmed that Jamie died by homicide from multiple gunshot wounds. According to Dr. Arboe, Jamie sustained one gunshot wound to his chest, one to the left side of his torso, one to his left arm, one to his left shoulder, one to his upper back, one to the side of his neck, and two to his head. During his examination of Jamie, Dr. Arboe recovered an intact bullet projectile from one of the head wounds and multiple fragments from the bullet that had entered through Jamie's neck. Dr. Arboe confirmed that Jamie's toxicology panel had shown that Jamie tested positive for methamphetamine and amphetamine. David Lockley, the section chief of toxicology at the Mississippi Forensics Laboratory, testified that he had performed a drug screen on a blood sample obtained from Whiddon following the shooting. Lockley stated that Whiddon's blood sample also tested positive for both methamphetamine and amphetamine.

¶47.    An expert in firearm identification from the Mississippi Forensics Laboratory compared the intact bullet projectile and the bullet fragments recovered during Jamie's

20

autopsy with test rounds fired from the revolver and rifle recovered at the scene of Whiddon's crash. The expert testified that the bullet and the fragments had matched the test rounds fired from Whiddon's revolver and the rifle. The expert further testified that a sawed-off shotgun, like the weapon taken from Jamie and April's mobile home, would not have been able to fire the bullet fragments that were recovered from Jamie's head during the autopsy.

¶48. After the State rested its case-in-chief, the defense called Anderson, Crutchfield, and Jackson to testify. All three witnesses acknowledged that they were presently incarcerated in the Lamar County jail. They declined, however, to testify about any knowledge they might have regarding Jamie's shooting. Even after the circuit judge ordered them to testify, all three men continued to refuse. The circuit judge held all three witnesses in contempt and declared them unavailable under Mississippi Rule of Evidence 804.

¶49. Under Rule 804, the defense sought to introduce into evidence Anderson's and Crutchfield's affidavits and the videotaped statements all three unavailable witnesses made during their recorded interviews with Investigator Wahl. After considering the parties' arguments as to whether the affidavits and videotaped statements should be admitted into evidence, the circuit judge expressed his concerns over the State's inability to cross-examine the unavailable witnesses about their prior statements. The circuit judge found that the declarants' "credibility [wa]s questionable at best[,]" and when coupled with "the prejudicial effects that occurred in the jailhouse in a gathering, . . . it would be more prejudicial to the State" than probative to admit the affidavits and videotaped statements into evidence for the

21

jury to review. The circuit judge excluded the evidence and allowed the defense to make a proffer of the excluded evidence to preserve the issue for appeal.

¶50. In his own defense, Whiddon testified about the events surrounding Jamie's death. Whiddon stated that in April 2019, he had lived with his then-fiancée Rebecca, Rebecca's two daughters, and Rebecca's granddaughter. Whiddon testified that on various occasions he had used methamphetamine with Rebecca, Jamie, April, Mike, and Gina. Whiddon even admitted that he had used methamphetamine on the day of Jamie's death.

¶51. As April had earlier testified, Whiddon stated that Jamie and April had arrived at his residence on April 13, 2019, so Jamie's nephew Shawn could go to prom with Rebecca's daughter Michaela. Whiddon disputed April's earlier testimony that there was a problem between him and Jamie during the visit. Whiddon confirmed that he had a pistol on his lap when Jamie and April arrived. Whiddon claimed that he always carried a gun in the waistband of his pants and that he had simply removed the pistol from his waistband and had placed it on his lap when he sat on the couch. In addition, Whiddon stated that he always kept weapons inside his vehicle. Whiddon explained that when Jamie, April, and Shawn had visited his home on April 13, 2019, he had a loaded rifle tucked between the front seats of his truck, which was parked outside. Whiddon denied that he had removed the loaded rifle from his truck during Jamie and April's visit or that he had pointed the weapon at Jamie and April.

¶52. Whiddon testified that Jamie, April, and Rebecca all left to take Shawn and Michaela to prom. After Rebecca returned, the weather started to get worse, and a tornado warning

22

was issued. Whiddon stated that after a discussion with Rebecca about the weather, he had gone to pick up Michaela from the prom and bring her home. Whiddon testified that when he arrived at the prom, he was told Michaela was not there. At that point, Whiddon stated that he had driven to Jamie and April's residence in search of Michaela.

¶53. Whiddon testified that after he had parked in front of Jamie and April's mobile home, Cody and Jamie both exited the residence. Whiddon stated that Cody walked toward the shop building and that Jamie headed his way. Whiddon denied that he shot Jamie as Jamie opened the door to the mobile home or as Jamie walked toward his truck. Instead, Whiddon stated that Jamie reached his truck, stopped just outside the open driver's side window, and began speaking with him. Whiddon testified that he asked about Michaela, and Jamie responded, "Don't worry about where Michaela is." Whiddon further testified that Jamie appeared to be high on drugs, and Whiddon reminded Jamie it was his (Whiddon's) responsibility to know Michaela's whereabouts. According to Whiddon, Jamie became angry, reached through the open driver's side window to grab Whiddon with his right hand, and began to pull Whiddon toward him. Whiddon testified that he then saw a "T-handled knife" in Jamie's left hand. Whiddon stated that Jamie raised the hand gripping the knife. In response, Whiddon claimed that he grabbed the pistol he set on the truck's center console and shot Jamie three times.

¶54. Whiddon testified that he was unsure whether he had hit Jamie, who had turned away and run toward the shop building. Whiddon stated that April appeared in the doorway of the mobile home carrying a sawed-off shotgun in her hands. Whiddon testified that he fired a

23

single shot at April, who ducked back inside the mobile home. Again, Whiddon stated that he was unsure whether his shot had struck April. Whiddon testified that he then heard "a shot [go] off over by the shop" building so he fired one more shot in that direction. When he glanced back toward the mobile home, he saw April once more standing at the door holding the sawed-off shotgun. Whiddon stated that he fired his pistol at her again, but his weapon "snapped." Whiddon testified that he then threw the pistol to the passenger floorboard, grabbed the loaded rifle, and fired multiple shots at April. According to Whiddon, April ducked back inside the mobile home, and he heard another shot fired from the direction of the shop building. Whiddon stated that he then pointed his rifle toward the shop and emptied the clip without really aiming.

¶55. Whiddon testified that he then drove away but ended up turning around and going back to Jamie's residence. Whiddon stated that he parked by the shop building, threw the then-empty rifle into the bed of his truck, and walked toward the shop building. As he approached the shop building, Whiddon testified that he saw Jamie lying on the ground. Whiddon stated that he sometimes experienced panic attacks and that he panicked when he saw Jamie. After getting back inside his truck, Whiddon drove away. He admitted that he fled from law enforcement, but he testified that the collision with Officer England was accidental rather than intentional. As a result of the collision, Whiddon sustained head injuries, including a concussion, which he stated caused memory loss for several months following the shooting.

¶56. On cross-examination, Whiddon admitted, "I did shoot Jamie Herrin." Whiddon

24

further admitted that in the emails he sent while imprisoned after the shooting, he never claimed that anyone else had a weapon. Instead, Whiddon conceded that in his emails, he provided multiple other versions of events regarding the shooting. He further conceded his in-court testimony was the first time he had claimed that he fired his guns in self-defense because Jamie had a knife and April had a shotgun. Whiddon also agreed that the emails he wrote during his pre-trial imprisonment never claimed that Cody possessed a gun at the time of Jamie's shooting.

¶57. Following Whiddon's testimony, the defense rested. The jury deliberated and found Whiddon guilty of first-degree murder (Count I), aggravated assault with a deadly weapon (Count II), aggravated assault of a law enforcement officer (Count III), and fleeing a law enforcement officer (Count IV). The circuit judge sentenced Whiddon to serve these sentences concurrently in MDOC's custody and ordered him to pay $30,000 in fines. After sentencing, Whiddon moved unsuccessfully for a judgment notwithstanding the verdict or, alternatively, a new trial. Aggrieved, Whiddon appeals.

## DISCUSSION

### I. Speedy-Trial Motions

¶58. Whiddon argues the circuit court erred by denying his motions to dismiss for lack of a speedy trial. In raising this issue on appeal, however, Whiddon focuses specifically on the delay between his arrest and his indictment. According to Whiddon, this pre-indictment delay of almost seventeen months violated his constitutional right to a speedy trial and resulted in the loss of the Manns' videotaped footage of the shooting, which Whiddon claims

25

prejudiced his defense.

¶59. In considering this issue, "we limit our analysis to [Whiddon's] actual arguments." *Roberts v. State*, 234 So. 3d 1251, 1268 (¶48) (Miss. 2017). "Although [Whiddon] labels this error as a violation of his Sixth Amendment right to a speedy trial, his arguments attacking the State's delay in initiating the prosecution center on his due[-]process rights under the Fifth Amendment to the United States Constitution." *Id.*[2] "The Due Process Clause of the Fifth Amendment has a 'limited role' in protecting the criminally accused against oppressive delay by the State in bringing prosecution." *Robinson v. State*, 247 So. 3d 1212, 1233 (¶52) (Miss. 2018) (quoting *United States v. Lovasco*, 431 U.S. 783, 789 (1977)). As the defendant, Whiddon bears the burden of proof "[i]n a pre[-]indictment analysis of due process violations . . . ." *Id.* (quoting *Stack v. State*, 860 So. 2d 687, 700 (¶30) (Miss. 2003)). "[T]o succeed on a claim that his . . . due-process rights were violated by a pre-indictment delay in prosecution, [Whiddon] must show that '(1) the pre-indictment delay prejudiced [him], and (2) the delay was an intentional device used by the government to obtain a tactical advantage over [him].'" *Id.* (quoting *Killen v. State*, 958 So. 2d 172, 189 (¶69) (Miss.

---

[2] Like Whiddon, the defendant in *Roberts* "argue[d] that a delay of approximately one year between his arrest and his indictment violated his constitutional right to a speedy trial." *Roberts*, 234 So. 3d at 1268 (¶48). Amidst other contributing factors, the record in the present case references a delay in receiving the final results of Jamie's autopsy as a reason for Whiddon's pre-indictment delay. Similarly, in *Roberts*, the pre-indictment delay was attributable to ongoing DNA testing. *Id.* at (¶50). As stated above, the Mississippi Supreme Court noted that although Roberts had asserted a violation of his right to a speedy trial under the Sixth Amendment, his appellate arguments actually focused on the pre-indictment delay and his due process rights under the Fifth Amendment. *Id.* at (¶48). Thus, the Supreme Court limited its analysis to the actual arguments that Roberts had raised on appeal, as we do here. *Id.*

2007)).

¶60. Here, Whiddon was arrested on April 13, 2019. He was indicted almost seventeen months later on September 2, 2020. As stated, Whiddon argues on appeal that the pre-indictment delay prejudiced his defense because the Manns testified that they had video footage of the shooting that had become unrecoverable by the time they delivered their computer hard drives to Investigator Wahl.

¶61. Contrary to Whiddon's arguments, we find that he has failed to meet either prong of the relevant test. First, the record contains no evidence to support Whiddon's assertions that the pre-indictment delay prejudiced his defense. The trial testimony revealed that the "pre-indictment delay reasonably cannot be characterized as having caused the destruction of the video surveillance tapes" and that the loss of the Manns' videotape footage instead resulted from other causes. *Roberts*, 234 So. 3d at 1268 (¶51). At trial, Mike testified that his computer hard drive recorded over footage after a certain period of time had passed. Mike stated that he was able to watch the footage after the shooting but that by the time he attempted to provide the video to law enforcement, the footage appeared to have been recorded over or rendered otherwise unreviewable.

¶62. Despite the loss of this video "evidence related to [Whiddon's] case, there is no indication that this evidence would have been exculpatory." *Id.* at 1234 (¶54). In fact, the record indicates the exact opposite. Whiddon himself admitted that he shot Jamie, and the autopsy results revealed that Jamie had sustained multiple gunshot wounds to his head and torso that were compatible with ammunition fired from the revolver and rifle that Whiddon

27

had in his possession. Mike testified that he watched the entirety of the video footage, and Gina testified that she watched until the first round of shooting occurred. Gina stated that in the portion of the video she watched, Jamie exited his mobile home and greeted Whiddon. Gina further stated that she could not see a weapon in Jamie's possession as he approached Whiddon. The jury heard from multiple other witnesses who, like Gina, testified that Jamie appeared to have no weapon in his possession at any point during the time that Whiddon initially shot him, drove away, returned, and then shot Jamie again.

¶63. In addition, as the State points out on appeal, "Whiddon never argued or presented any evidence that the delay in his indictment was intentionally caused by the State to hamper his defense . . . ." "[D]elays prior to indictment are considered investigative delays, and an 'investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over the accused.'" *Lewis v. State*, 374 So. 3d 529, 553 (¶95) (Miss. Ct. App. 2023) (quoting *Harris v. State*, 311 So. 3d 638, 665 (¶80) (Miss. Ct. App. 2020)), *cert. denied*, 375 So. 3d 672 (Miss. 2023), *pet. for cert. filed*, No. 23-7089 (U.S. Mar. 27, 2024). Here, the pre-trial filings and the arguments made during the pre-trial hearings reflect that both parties attributed the pre-indictment delay to the absence of Jamie's autopsy results, which the parties in turn attributed to the case backlog at the Mississippi Medical Examiner's Office. Although the State eventually presented the charges to the grand jury without the autopsy results, the record fails to demonstrate that the State's conduct at any point during the relevant time period was an intentional ploy to gain a tactical advantage over the defense. And as our caselaw provides, "[p]rosecutors are under no duty to file charges as soon as

28

probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." *Robinson*, 247 So. 3d at 1234 (¶54) (quoting *Lovasco*, 431 U.S. at 791). Because Whiddon has failed to sufficiently prove that the pre-indictment delay in prosecuting his case violated his due process rights, we find no reversible error with regard to this issue.

## II. Excluded Videotaped Witness Statements

¶64. Whiddon also contends that the circuit court erred by excluding the three videotaped statements that Investigator Wahl obtained during his interviews with Anderson, Crutchfield, and Jackson. After Anderson, Crutchfield, and Walker provided the defense with affidavits stating that they heard Cody admit to shooting Jamie, Investigator Wahl went to the prison to interview the three men. Although Walker recanted his statement, Anderson and Crutchfield maintained that they heard Cody make the admission. During his investigation, Investigator Wahl also spoke with Jackson, who similarly stated during a videotaped interview that he had heard Cody admit to killing Jamie. At trial, Anderson, Crutchfield, and Jackson each refused to testify. After the circuit court declared the three witnesses unavailable under Rule 804(b), the defense unsuccessfully sought to introduce the affidavits and videotaped interviews into evidence.

¶65. "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses his discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Holliman v. State*, 178 So. 3d 689, 704 (¶37) (Miss. 2015) (quoting *Green v. State*, 89 So. 3d 543, 549 (¶15) (Miss. 2012)). In discussing the

29

hearsay exceptions that apply when "the declarant is unavailable as a witness[,]" the residual exceptions provided by Rule 804(b)(5) include the following:

> [a] statement not specifically covered by this Rule if: (A) the statement has equivalent circumstantial guarantees of trustworthiness; (B) it is offered as evidence of a material fact; (C) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; (D) admitting it will best serve the purposes of these rules and the interests of justice; and (E) before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

M.R.E. 804(b)(5). "Thus, . . . to be properly admitted under the residual exceptions to the hearsay rule, an out-of-court statement must be tested for trustworthiness, materiality, probative value, the interests of justice, and notice." *Etheridge v. Harold Case & Co.*, 960 So. 2d 474, 485 (¶29) (Miss. Ct. App. 2006).

¶66. Here, the circuit judge expressed concerns over the trustworthiness of the proffered statements and their potential prejudice to the State. As Whiddon asserts on appeal, however, the videotapes he sought to introduce were made by Investigator Wahl, an agent acting on the State's behalf. Investigator Wahl questioned each of the original three inmates about their affidavits. Through this process, which was videotaped, one inmate recanted his statement, two others maintained the substance of their original statements, and Investigator Wahl discovered a fourth inmate who similarly claimed that Cody had admitted to shooting Jamie. Thus, the record reflects that at least two of the inmates "gave two statements which were the same in substance." *Randall v. State*, 806 So. 2d 185, 206 (¶41) (Miss. 2001) (discussing the testimonial trustworthiness of an unavailable declarant's recorded statement

30

to law enforcement). Moreover, the three videotaped statements that Whiddon sought to introduce into evidence were obtained not by the defense but by Investigator Wahl during the course of his investigation. "There is a circumstantial guarantee of trustworthiness in the simple fact that" the procurement of the excluded evidence derived "from the State[,] whose position and interests were diametrically opposed to those of [Whiddon]." *Id.* And with regard to the circuit judge's concern over prejudice to the State, "[i]t is well established by prior decision[s] of [our Supreme] Court that the right of confrontation under the Sixth Amendment of the United States Constitution and the Mississippi Constitution does not inure to the benefit of the State in prosecuting criminal cases." *Butler v. State*, 702 So. 2d 125, 129 (¶18) (Miss. 1997).

¶67. Upon review, we find the circuit court abused its discretion by excluding the three videotaped statements. In light of the overwhelming weight of the evidence against Whiddon, however, we also find the error was harmless. *Augustine v. State*, 337 So. 3d 646, 652 (¶27) (Miss. 2022) ("Even if an error occurs at trial, 'we will not reverse a conviction where the overwhelming weight of the evidence supports the guilty verdict.'" (quoting *Tate v. State*, 912 So. 2d 919, 926 (¶18) (Miss. 2005))). "Here, the evidence adduced at trial, along with numerous inconsistencies in [Whiddon's] account of the incident and the obvious flaws in his self-defense claim, supports a guilty verdict of second-degree murder." *Id.*

¶68. The jury heard and considered both Investigator Wahl's testimony about obtaining the recorded statements and the defense's cross-examination of Cody in which Whiddon's attorney asked if Cody had confessed to other inmates that he shot Jamie. Whiddon's

31

attorney established on cross-examination that Cody had been imprisoned in the Lamar County Regional jail in 2020 and 2021. Whiddon's attorney asked whether Cody knew the four men who had provided the statements regarding Cody's alleged jailhouse confession. Cody stated that he had not known who the four men were until Investigator Wahl arrived at the prison to ask him about their affidavits and videotaped statements asserting his involvement in Jamie's shooting. Throughout his testimony, Cody repeatedly denied that he had shot Jamie or that he ever confessed to other inmates that he had committed the crime.

¶69. We also conclude upon review that the record contains overwhelming evidence for a jury to find Whiddon guilty beyond a reasonable doubt of Jamie's death. The State presented numerous witnesses who testified about the events leading up to and surrounding Jamie's death. Multiple eyewitnesses identified Whiddon as the person who had fatally shot Jamie, and the jury heard the many 911 calls made by those present at the time of the shooting. The jury also heard testimony about Jamie's cause and manner of death and that the bullet and fragments recovered during his autopsy had matched the test rounds fired from Whiddon's revolver and rifle. In addition, the State presented testimony and evidence about Whiddon's in-person and email conversations following his arrest. The jury also heard Whiddon's own testimony. Not only did Whiddon admit to shooting Jamie, but the State also vigorously cross-examined him about the inconsistencies in his testimony and his multiple versions of the events that led to Jamie's death. Thus, the jury had ample evidence before it to find Whiddon guilty of Jamie's death. Accordingly, we hold that any error in the exclusion of the videotaped statements was harmless.

### III.    Circuit Judge's Comments about Investigator Wahl

¶70.    During Investigator Wahl's direct examination, Whiddon's attorney made the following objection, "He's telling what other people [who] are scheduled to testify told him[,] and we have a right to confront them directly.  This is absolutely hearsay.  He's repeating what somebody else told him."  In response to the objection, the circuit judge stated:

> He is, but it's in the course of the investigation[,] and the Court has repeatedly ruled that is appropriate and proper and at the Court's discretion.  I have the discretion knowing that Mr. Wahl is an excellent -- or I believe he's an excellent investigator and that he was investigating the scene and the witnesses and he can state to the examining lawyer as to what he saw and heard.

¶71.    Whiddon asserts on appeal that in explaining his ruling, the circuit judge improperly vouched for Investigator Wahl's credibility, which resulted in prejudice to the defense.  The record reflects, however, that Whiddon failed to raise any objection at trial to the circuit judge's comments.  "Failure to object to a trial court's allegedly improper comments at trial will waive the issue on appeal."  *Moffite v. State*, 309 So. 3d 529, 538 (¶38) (Miss. Ct. App. 2019).  We therefore find this argument is procedurally barred.

¶72.    In addition to the waiver, we recognize that "[t]rial judges may explain their rulings on evidentiary objections so long as they do not comment upon the evidence in a prejudicial manner."  *Abram v. State*, 309 So. 3d 579, 583 (¶8) (Miss. Ct. App. 2020) (quoting *Burnett v. State*, 231 So. 3d 1001, 1008 (¶18) (Miss. Ct. App. 2017)).  "[A] remark of a trial judge necessarily made while ruling on an objection does not constitute grounds for reversal.  Judges are not prohibited from telling counsel the reason for the ruling."  *Washington v.*

33

*State*, 957 So. 2d 426, 429 (¶15) (Miss. Ct. App. 2007) (quoting *Haralson v. State*, 314 So. 2d 722, 724 (Miss. 1975)). Here, Whiddon himself acknowledges that the circuit judge's comments were made incident to his ruling on the defense's objection to Investigator Wahl's testimony. The record reflects that in explaining the ruling, the circuit judge neither impermissibly "sum[med] up [n]or comment[ed] on the testimony" or the evidence so as to prejudice the defense. *Washington v. State*, 355 So. 3d 798, 805 (¶23) (Miss. Ct. App. 2023) (quoting *Roberson v. State*, 287 So. 3d 219, 243 (¶84) (Miss. Ct. App. 2017)).

¶73. Moreover, the record establishes that the circuit judge's instructions to the jury included the following directive:

> It is the duty of the judge to be completely fair to both sides in this trial, and if any instruction, ruling, or statement by the Court seems to indicate to you that the Court has any opinion about the case or any particular fact, such indication would be completely false, and you must disregard it.

"As an appellate court, we must assume that juries follow the instructions of the trial court." *Abram*, 309 So. 3d at 584 (¶8) (quoting *Cobb v. State*, 734 So. 2d 180, 181 (¶4) (Miss. Ct. App. 1999)). We therefore find no reversible error regarding the argument that Whiddon now raises on appeal.

### IV. Self-Defense Jury Instruction

¶74. Whiddon next alleges that the circuit judge improperly instructed the jury on self-defense and impermissibly shifted the burden of proof to the defense. We review the circuit judge's decision to give a jury instruction for abuse of discretion. *Sands v. State*, 315 So. 3d 1066, 1070 (¶10) (Miss. Ct. App. 2020). "Jury instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. When read together,

34

if the jury instructions fairly state the law of the case and create no injustice, then no reversible error will be found." *Bingham v. State*, 373 So. 3d 1042, 1047-48 (¶18) (Miss. Ct. App. 2023) (quoting *Nelson v. State*, 284 So. 3d 711, 716 (¶18) (Miss. 2019)).

¶75.   Here, the jury instruction at issue stated the following:

> The Court instructs the jury that one who claims self-defense as a defense to his actions may not use excessive force to repel the attack, but may use only such force as is reasonably necessary under the circumstances.  If you find from the evidence, beyond a reasonable doubt, that the defendant, Norman Whiddon, Jr., used more force than was reasonably necessary under the circumstances, then the defendant may not use self[-]defense as a defense to his action.

¶76.   During the jury-instruction conference, the defense raised no objection to the jury instruction on self-defense.  "A party is required to submit instructions or object to instructions to preserve those issues for appeal." *Davis v. State*, 347 So. 3d 1205, 1211 (¶14) (Miss. Ct. App. 2022) (citing MRCrP 22(d)).  "[I]ssues not brought before the trial court are deemed waived and may not be raised for the first time on appeal." *Id.*  Notwithstanding the waiver, we also find a lack of merit to Whiddon's assertion that, as written, the given jury instruction erroneously "placed the burden of proof on [him] to prove that he did not use excessive force."

¶77.   Despite his claims on appeal, Whiddon fails to cite any relevant caselaw disapproving of a similar instruction.  "[O]ur Supreme Court has 'held that a person may not use more force than reasonably appears necessary to save his life or protect himself from great bodily harm.'" *Hearns v. State*, 313 So. 3d 533, 541 (¶24) (Miss. Ct. App. 2021) (quoting *Griffin v. State*, 495 So. 2d 1352, 1354 (Miss. 1986)).  Moreover, this Court has repeatedly upheld

35

a circuit court's decision to give jury instructions that contain almost identical language. *See id.*, at 540-41 (¶¶23-24) (finding no ineffective assistance in defense counsel's request for a self-defense instruction that contained nearly identical language); *Duke v. State*, 146 So. 3d 401, 405 n.2 (Miss. Ct. App. 2014) (finding that an almost identical instruction "properly instructed [the jury] on self-defense"); *Ellis v. State*, 956 So. 2d 1008, 1014 (¶12) (Miss. Ct. App. 2007) (holding that an almost identical instruction, along with two others on self-defense, "adequately apprised the jurors of . . . the law as it pertains to self-defense"). Thus, based on relevant caselaw, we find no abuse of discretion in the circuit court's decision to give the jury instruction on self-defense.

## V.     Sufficiency of the Evidence

¶78.    Whiddon also challenges the sufficiency of the evidence that supported his conviction for first-degree murder. We review challenges to the legal sufficiency of the evidence de novo. *Henderson v. State*, 376 So. 3d 412, 417 (¶14) (Miss. Ct. App. 2023). As we have previously explained:

> The legal sufficiency of the evidence is viewed in a light most favorable to the State. All evidence supporting a guilty verdict is accepted as true, and the State is given the benefit of all favorable inferences that can be reasonably drawn from the evidence. Under this review, this Court is not required to decide whether we think the State proved the elements. Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved its case.

*Goode v. State*, 374 So. 3d 592, 604 (¶27) (Miss. Ct. App. 2023) (citations and internal quotation marks omitted).

¶79.    On appeal, Whiddon asserts that he was "the only person with any knowledge of what

36

happened" between himself and Jamie when Jamie approached the truck window. Whiddon further asserts that under *Weathersby v. State*, 165 Miss. 207, 147 So. 481 (1933), his self-defense claim as to the charge of murder should be accepted. "The *Weathersby* rule essentially is a specific kind of challenge to the sufficiency of the evidence." *Henderson*, 376 So. 3d at 418 (¶16) (quoting *Figueroa v. State*, 337 So. 3d 1104, 1113 (¶30) (Miss. Ct. App. 2021)). The *Weathersby* rule provides the following:

> [W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

*Weathersby*, 165 Miss. at 207, 147 So. at 482.

¶80. Whiddon "failed to make the *Weathersby* argument as a ground for a directed verdict before the trial court, which procedurally bars the argument" on appeal. *Beasley v. State*, 362 So. 3d 112, 127 (¶55) (Miss. Ct. App. 2023). Notwithstanding the waiver, we note that Whiddon was not the only witness to Jamie's shooting. April testified that she watched from the camera monitor inside as Jamie walked outside and approached Whiddon's truck. Cody also testified that he exited the mobile home just ahead of Jamie once Whiddon arrived. Both April and Cody stated that Jamie had no weapon in his possession as he exited the mobile home. April testified that she watched Jamie rest his forearms on the open window of Whiddon's truck, and she maintained that she never saw Jamie attempt to reach inside the truck. Cody added during his testimony that he heard no threatening exchange of words between Whiddon and Jamie before the first shots.

¶81. In addition, Jamie's brother-in-law Mike testified that he was sitting across the street in front of his own residence when Whiddon pulled up and parked his truck. Mike recounted that Jamie had greeted Whiddon from the door of the mobile home and then the gunshots started. Mike testified that he never observed a weapon in Jamie's possession.

¶82. These witnesses provided credible testimony regarding the events leading to Jamie's death, and their accounts of the shooting substantially and materially contradicted Whiddon's version of events. In addition, both the witness testimony and the autopsy results refuted Whiddon's in-court claim that he had only shot Jamie in self-defense. The State's witnesses to the events surrounding the shooting testified that Jamie had no weapon in his possession and that Whiddon shot Jamie, drove away, returned, and then shot Jamie again. The autopsy results confirmed that Jamie had died by homicide from multiple gunshot wounds, including one to his back and two to his head.

¶83. Another "limitation on the *Weathersby* rule is that it does not apply when the defendant gives inconsistent accounts of the killing prior to and at trial." *Henderson*, 376 So. 3d at 418 (¶16) (quoting *Figueroa*, 337 So. 3d at 1113 (¶31)). Here, Whiddon provided multiple accounts of the circumstances surrounding Jamie's death. Whiddon admitted on cross-examination that the emails he had written during his pre-trial incarceration offered multiple explanations for the events that had occurred. Moreover, he conceded that his in-court testimony was the first time he claimed he had shot Jamie in self-defense because Jamie had a knife.

¶84. Aside from finding that the *Weathersby* rule is inapplicable, we conclude that the State

presented sufficient evidence for a rational juror to find Whiddon guilty of first-degree murder beyond a reasonable doubt. The State bore the burden to prove beyond a reasonable doubt that Whiddon "(1) killed the victim, [Jamie], (2) without the authority of law, and (3) with deliberate design to effect [Jamie's] death." *Goode*, 374 So. 3d at 604 (¶28); *accord* Miss. Code Ann. § 97-3-19(1)(a) (Supp. 2017). In previously discussing the evidence sufficient to support first-degree murder, this Court recognized:

> Deliberate design connotes an intent to kill. Our Supreme Court has held that unless one expresses his intent, the only method by which intent may be proved is by showing the acts of the person involved at the time, and by showing the circumstances surrounding the incident. Additionally, our Court has held:
>
>> The essence of the required intent is that the accused must have had some appreciable time for reflection and consideration before committing the fatal act. Deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent. Furthermore, deliberate design may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury.

*Henderson*, 376 So. 3d at 420 (¶23) (citations and internal quotation marks omitted).

¶85. Whiddon admitted at trial that he shot Jamie. The State presented evidence that Whiddon had acted threateningly toward Jamie earlier the same day and then drove to Jamie's residence with multiple weapons in his truck. Testimony from multiple witnesses refuted Whiddon's claim of self-defense and instead provided that Jamie had no weapon in his possession when he exited the mobile home and greeted Whiddon. The witness testimony further refuted Whiddon's claims that Jamie acted or spoke in an aggressive or threatening manner toward him. Instead, the multiple witness accounts, as well as the multiple 911 calls

39

played for the jury, reflected that Whiddon shot Jamie, drove away, returned, and then shot Jamie again. Viewing the evidence in the light most favorable to the State, we conclude that a rational juror could have found the State presented sufficient evidence to prove beyond a reasonable doubt that Whiddon killed Jamie with deliberate design. We therefore find no error regarding Whiddon's assertion that insufficient evidence supported his conviction for first-degree murder.

## VI. Weight of the Evidence

¶86. In his final assignment of error, Whiddon argues that his murder conviction was against the overwhelming weight of the evidence. We review the circuit court's ruling denying Whiddon's challenge to the weight of the evidence for abuse of discretion. *Henderson*, 376 So. 3d at 418 (¶15). In so doing, we "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable justice." *Id.* (quoting *Eaton v. State*, 359 So. 3d 1081, 1086-87 (¶22) (Miss. 2023)). We only grant "[a] new trial based on the weight of the evidence . . . in exceptional cases in which the evidence preponderates heavily against the verdict." *Id.* (quoting *Alvarado v. State*, 343 So. 3d 391, 399 (¶26) (Miss. Ct. App. 2022)). In addition,

> [i]t is well established that the jury determines matters of weight, credibility, and conflicting evidence. We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury. . . . [S]elf-defense is a question of weight and credibility for the jury to decide. A successful self-defense argument requires that the jury believe it was objectively reasonable for the defendant to believe he was in danger of imminent death or serious bodily harm.

*Id.* at 421 (¶28) (citations and internal quotation marks omitted).

¶87.    Whiddon admitted on cross-examination that in the emails he had written during his pre-trial incarceration, he provided several explanations for the events culminating in Jamie's death.  Whiddon also admitted that his trial testimony was the first time he claimed that he shot Jamie in self-defense because Jamie had a knife that he used in a threatening manner. All the other eyewitnesses to Jamie's shooting disputed Whiddon's self-defense claim.  The testimony of the other eyewitnesses provided that Jamie had no weapon in his possession as he approached Whiddon's truck and that Jamie neither spoke nor acted in a threatening manner toward Whiddon before the shots occurred.

¶88.    The record reflects that Whiddon provided multiple versions of the events leading to the shooting and that the State provided substantial evidence to refute Whiddon's self-defense claim at trial.  Whiddon acknowledged under oath that he shot Jamie, and ultimately, it was for the jury to decide whether Whiddon's in-court account of self-defense was credible or whether to resolve any evidentiary conflicts in the State's favor.

¶89.    Without repeating the evidence previously discussed, we find that when viewed in the light most favorable to the verdict, the record contains ample evidence from which this jury could have found Whiddon guilty of first-degree murder beyond a reasonable doubt.  Here, the jury heard and considered all the evidence and testimony, including any inconsistencies, and weighed the credibility of the witnesses.  After doing so, the jury found Whiddon guilty of the indicted charges, including first-degree murder.  We cannot say that allowing the jury's verdict to stand will result in an unconscionable injustice, and the verdict was not contrary

41

to the weight of the evidence.  We therefore find no abuse of discretion.

## CONCLUSION

¶90.    Because we find no reversible error, we affirm Whiddon's convictions and sentences.

¶91.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE AND McCARTY, JJ., CONCUR.  McDONALD AND EMFINGER, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**